# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
April 21, 2021 Session

## HUNTER RYAN ELLIS, ET AL. V. CHRISTINA L. DUGGAN, ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. 18-0351  Jeffrey M. Atherton, Chancellor**

_____

### No. E2020-00723-COA-R3-CV

_____

This is a case involving allegations of undue influence. The plaintiffs are the grandchildren of the decedent. The sole defendant at issue on appeal is the decedent's niece, who also held power of attorney for the decedent during the last years of her life. The transaction at issue occurred roughly six months before the decedent died and consisted of a gift of $176,000 to the niece for the purchase of a house. The executor of the decedent's estate declined to pursue the claim for undue influence and assigned the cause of action to the decedent's four grandsons, who were the residuary beneficiaries of the estate. After a five-day bench trial, the trial court found that a confidential relationship existed between the decedent and the defendant niece and that multiple suspicious circumstances existed to support a finding of undue influence. As such, the trial court entered a judgment against the defendant niece for $176,000. However, the trial court denied the plaintiffs' request for attorney fees on the basis that they were "not available under the current caselaw relating to undue influence." The defendant niece appeals, challenging the finding of undue influence. The plaintiffs appeal the denial of their request for attorney fees. Having carefully reviewed the voluminous record, we affirm the finding of undue influence and the judgment against the defendant niece. We reverse the denial of the plaintiffs' request for attorney fees and remand for a reasonable award of attorney fees incurred by the plaintiffs in the trial court and on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Michael M. Thomas and W. Neil Thomas, III, Chattanooga, Tennessee, for the appellant, Christina L. Duggan.

David L. Moss, Signal Mountain, Tennessee, for the appellees, Hunter Ryan Ellis and

Nicholas Ray Ellis.

Linda J. Norwood, Chattanooga, Tennessee, for the appellee, Michael David Ellis, II, individually and as guardian for William David Ellis.

## OPINION

## I. FACTS & PROCEDURAL HISTORY

Jean Ellis was born in 1931 and married O. David "Dave" Ellis in 1950. Jean and Dave had two children, Rick and Mike.[1] During their fifty-year marriage, Jean and Dave accumulated considerable wealth. When Dave died in 2002, a substantial portion of that wealth passed to Jean. Dave's will also set up a family trust for the benefit of Jean during her lifetime, with the remainder to go to his heirs. After Dave died, Jean resided alone on the family farm in Signal Mountain, Tennessee, and one of her grandsons resided in a smaller home on the farm. Jean's younger sister, Judy Morgan, lived nearby in Soddy Daisy. Judy's daughter, Christina L. Duggan, lived in Chattanooga.

In late 2011, Jean's son Mike moved in with Jean after he was diagnosed with early onset dementia and became unable to care for himself. Jean and Mike were very close, and she was very protective of him. One of Jean's biggest fears was her uncertainty regarding what would happen to Mike if she died. In 2012, at the age of 81, Jean updated her estate plan in consultation with attorney Stephen Jett at the law firm of Chambliss, Bahner, & Stophel. Mr. Jett had represented Jean and Dave in various estate planning matters over the years (although another firm handled the probate of Dave's estate). After meeting with Mr. Jett, Jean decided to revise her will and to execute a power of attorney naming her niece Christina as her attorney-in-fact. Christina was a physical therapist and was in the process of starting a new elder care business, called Care Connections, in which she would serve individuals in the capacity of "care manager." Mike was also in need of care, but it was decided that Rick would be designated as attorney-in-fact for Mike. Mr. Jett directed a new associate at the firm, Ryan Barry, to draft the relevant documents. At that time, Jean's estate was worth somewhere around $2.4 million. Jean initially planned to include in her will specific bequests of $50,000 to her sister Judy and $50,000 to her niece Christina, with the residue being divided amongst a trust for Mike, her other son Rick, and her grandchildren. During the meeting with Mr. Jett, which Christina also attended, Jean decided to increase the gift to Christina from $50,000 to $75,000. Later, Jean called Mr. Jett to say she had decided instead to include a specific bequest of $70,000 to Christina and to give Christina a present gift of $5,000 to assist her with the new business she was starting.[2] Aside from one smaller gift to a neighbor, the remainder of Jean's estate

---

[1] Because a number of individuals share the same last name, we will refer to the parties by their first names. We mean no disrespect.

[2] Ultimately, Jean gave Christina $10,500 for the new business.

- 2 -

would be left to Rick, the trust for Mike, and the grandchildren.

Jean executed her revised will to this effect on December 14, 2012. On the same date, she executed a Durable General Power of Attorney and a Durable Power of Attorney for Health Care, designating Christina as her attorney-in-fact. The General Power of Attorney document was a standard form that contained two alternative gift provisions that could be selected: one that prohibited the attorney-in-fact from making any non-charitable gifts or other gratuitous transfers pursuant to the power of attorney, and a second option that would permit the attorney-in-fact to make non-charitable gifts under certain circumstances. Jean initialed the option that prohibited Christina from making any non-charitable gifts pursuant to the power of attorney. Christina received compensation of around $1,000 per month for her services as power of attorney.

Around the same time when Jean executed these documents, she was diagnosed with an aggressive form of pancreatic cancer. In early 2013, she underwent major surgery for the removal of portions of her pancreas, small intestine, bile duct, and gall bladder.[3] Over the next two years, Christina acted as attorney-in-fact for Jean on numerous occasions using the powers granted in the general power of attorney and the power of attorney for healthcare. Christina did not act in the role of a "caregiver" for Jean. Instead, she helped to manage, monitor, and pay full-time caregivers for Jean who were employed by caregiving agencies. Christina also took Jean to doctor's appointments and helped her with financial matters, such as reviewing Jean's accounts with her periodically to update her on how much money she had. The bank statement for Jean's checking account was sent to Christina's house. Christina would communicate with the trustee of the family trust and request more money when Jean was "running short on funds."

In her role as attorney-in-fact, Christina often communicated with Mr. Jett at Chambliss Bahner in regard to Jean and her financial affairs. In May 2013, Christina informed Mr. Jett that she was having trouble accessing Jean's bank accounts and asked him to contact the bank manager to resolve the issue. She suggested that the bank was unnecessarily requiring Jean to sign additional documents rather than honoring the power of attorney, when Jean was so malnourished that she was "not thinking rationally and will not sign anything, nor is she able to fully comprehend what she is signing." Upon investigation by associate Ryan Barry, he learned Christina was seeking to be added as "a joint owner" of Jean's bank account rather than a mere signatory, and because the power of attorney did not contain gifting powers, the bank would not allow this unless Jean signed a new signature card. The attorneys and bank manager agreed that there was no need for Jean to sign anything if Christina was only a signatory on the account.

---

[3] At a meeting with Mr. Jett in April 2013, Jean stated that she wished to revoke the powers of attorney granted to Christina and to replace them with powers of attorney in favor of her son Rick. Mr. Jett prepared the documents and sent them to Jean, but for some unknown reason, they were never executed.

Another issue arose in September 2013. Christina asked Mr. Jett about the possibility of the trust purchasing a house for her to live in with Mike and whether she would have to purchase another house on her own once Mike died. Mr. Jett asked Ryan Barry to look at Jean's will and its provisions regarding the trust for her disabled son but noted it seemed to him that Christina was "getting out of bounds." Mr. Barry similarly responded with concern that the proposed course of action could be interpreted as Christina using trust assets for her own benefit.

Later that month, Mr. Jett forwarded marketing materials for Christina's new elder care business to another attorney at Chambliss Bahner, indicating that she was doing an excellent job managing Jean's care. Over time, a "business referral relationship" developed between Chambliss Bahner and Christina, in which Christina would refer clients to Chambliss Bahner for legal services and Chambliss Bahner would refer clients to Christina and/or Care Connections for care management. Thus, Christina worked on several cases with Chambliss Bahner attorneys and staff for mutual clients. The website for Christina's business contained endorsements from an attorney and a paralegal from Chambliss Bahner.

In November 2013, Jean's attorney, Steve Jett, met with Christina and with the trustee of the family trust, Grady Williams, who was a long-time family friend and an accountant, to discuss Jean's financial situation. Mr. Jett summarized the meeting in the following letter addressed to Jean's son, Rick, and Mike's son, Michael, Jr., on November 7, 2013:

Dear Rick and Michael:

I deeply regret the continued disabling health problems that Jean is experiencing. She has a long road ahead of her, and around-the-clock care is very important.

Grady Williams and I met with Chris Duggan this week to review Jean's current and long-term financial situation. . . .

Grady and I both feel that it is very important to take several measures to conserve Jean's financial resources. She may require extensive medical care and personal care for an extended period of time. For the foreseeable future, 24/7 personal care is needed for Jean. Personal care for Mike Ellis should be continued. In addition, we believe the following steps should be initiated immediately:
1. Close the farm operation and sell all cattle. . . .
2. List the Dayton Boulevard property for sale.
3. List Mike's house on Thicket Road in Soddy Daisy for sale.
4. List the four Gatlinburg condominiums for sale.

5. Sell Mike's cars to provide additional funds for his care.
6. Finally, a bookkeeper should be engaged to organize Jean's finances, pay bills, etc. . . .

Grady and I will be happy to meet with either or both of you to get your input regarding these recommendations or any other matters related to Jean or her financial affairs. Most of our recommendations can be carried out by Chris Duggan[4] under the Power of Attorney Jean gave her several months ago.

According to Mr. Jett's testimony in this case, the assets listed in this letter were items that could be liquidated that were not needed at that time considering that Jean "needed assets for her care."

In 2014, Jean's health issues continued. An email from Christina to Mr. Jett and Mr. Williams stated that despite some physical improvement, Jean's memory was poor, she was "very confused much of the time," and she would likely require "24/7 care on a long-term basis."[5] Jean's doctors discontinued her chemotherapy indefinitely, and she was diagnosed with depression and anxiety. She had compression fractures in her back and underwent various procedures to address the pain. She used a wheelchair for mobility. Her dosage of hydrocodone had to be reduced from 10 milligrams to 5 milligrams due to "increased sedation," but yet her pain was not improved with the lesser dosage. Jean tried but was unable to tolerate other pain medication. She was described in medical records as having "a very difficult time, with increasing lower back pain and frustration and anxiety."

By 2015, Jean and Mike were both receiving "24/7" care from at least one but oftentimes two caregivers. The caregivers assisted Jean by bathing and dressing her, cleaning her house, preparing meals, accompanying her to doctor's appointments, administering medication, and providing companionship for her. The requested distributions from the family trust increased in 2015, as Jean's expenses for the caregivers totaled around $20,000 per month. Checks from Jean's account reflect payments to caregiving agencies for large sums as high as $23,000.

In January 2015, Christina emailed Mr. Jett stating that Jean wanted to make a few changes to her will. Christina acknowledged that she did not know if Jean was "cognitively able to do so" and asked for Mr. Jett's help evaluating this. Christina stated that Jean's most recent medical record from the oncology clinic documented her to be alert and oriented and able to verbalize understanding of discussions. "That being said," Christina added, "her memory is very impaired." Christina said that Jean was "able to understand

---

[4] Throughout the record, Christina is sometimes called "Chris."
[5] In this same email, Christina asked Mr. Jett to call Rick "and explain to him that he has no legal rights to conduct any of [] Jean's business or do any work on any of her properties without my prior approval." It is not clear from the record how that situation was resolved.

concepts and specifics if explained to her simply and slowly" but she "has to take one thing at a time" and "can't focus on several things at once." Christina also noted that any changes would likely be challenged by the family. A few days later, Christina emailed Mr. Jett again to inform him that Jean had attended another doctor's appointment. She added, "I asked them to do a mental status exam in order to have further documentation of her ability to make changes in her will." Christina stated that her mother Judy had accompanied Jean to the appointment and reported that Jean "answered everything correctly." Christina asked to set up a meeting at Mr. Jett's office later in the week. According to Christina, Jean preferred to meet there in order to have more privacy in light of the caregivers at her home. Christina said that she would bring Jean to the meeting but go out of the room whenever they wanted to speak privately. Christina said she planned to "make [Mr. Jett] a list of things that she's mentioned to me that she's considering changing so that [he could] review them with her."

Mr. Jett met with Jean, Christina, and Grady Williams in February 2015, and they discussed whether Jean wanted to make changes to her will. However, no changes were made to the will before Mr. Jett announced his retirement the following month, in March 2015. In a letter to Jean, which was also sent to Christina, Mr. Jett recommended that Jean work with associate Ryan Barry concerning any questions she might have or any changes she might want to make in her will. One of the items they had discussed during the recent meeting was whether to give Jean's grandson, Nick, an option to purchase the home where he lived on the family farm, at appraised value, using his inheritance money at Jean's death. Mr. Jett explained that Jean's wishes regarding the option could be expressed in a written letter to her executor without changing her will, and he attached a letter to that effect that he had drafted for her signature before a notary public. Mr. Jett retired on March 31.

According to Christina, in May or June 2015, she and Jean were in the neighborhood where their families were raised when they saw a house for sale. According to Christina, they looked at the house "just kind of for fun," and Jean asked Christina if she really liked the house. Christina said she did. The owners quoted a price for it, but the house was sold the next day. Again, according to Christina, Jean "felt bad" that she had not purchased the house for Christina, and they began to look at some other houses. Jean and Christina had discussed many times the idea of Christina and Mike sharing a house. Admittedly, Christina knew there was a possibility that Rick, Mike's brother and attorney-in-fact, would not allow Mike to live with her. Still, she and Jean periodically discussed the idea. Christina had a house of her own, but she believed that it would have been difficult for Mike to live there because it had stairs and a sloping yard. Unbeknownst to Rick or Jean's grandsons, Jean and Christina went on to view two more houses together after this first one.

On July 7, 2015, Christina sent an email to her "[b]usiness social" acquaintance at Chambliss Bahner, Sally Brewer. Ms. Brewer was a "Care Coordinator . . . Slash paralegal" at Chambliss Bahner, and Christina had worked with her on several cases.

Christina's email read:

> Hi Sally,
> When Steve Jett retired, he suggested that we work with Ryan Barry for any future changes to my aunt's will. If Dana [an attorney at Chambliss Bahner] has no objection to our working with Ryan (potential conflict of interest), we need to set up a time next week for Ryan to come to her home to discuss her will. . . . I'll try to refine the things she wants to change prior to that time and send them to you. She saw Dr. Holland yesterday and he determined that she is still medically competent to make revisions to her will.[6] Just let me know what works for Ryan. Thanks for your help.

When Ms. Brewer responded that Ryan Barry's schedule was "pretty booked," Christina reiterated her request for a meeting later that same week or the next week. She added, "I just don't want to get too far from her visit with Dr. Holland yesterday." A meeting was scheduled for July 23. Records indicate that on July 20, Christina and Ms. Brewer spoke on the phone "regarding information for updates to Jean's will." On July 21, Christina called and canceled Jean's July 23 appointment.[7]

On July 27, Christina and Jean toured a third home along with Judy, Judy's husband, and Christina's friend. After a discussion between Jean and Christina in a back bedroom, Christina made an offer on the house. That same day, Christina signed a contract to purchase the house in her name only. Christina wrote a check for $1,000 from Jean's checking account for the earnest money, completely filling out the check herself and signing it with her own name as "POA." On July 30, Christina filled out a second check from Jean's bank account, this time payable to herself, for $175,000. In Christina's handwriting, the memo line simply reads, "Gift." Only the signature on this check was in Jean's handwriting. However, Jean's bank account did not contain sufficient funds to cover the $175,000 check. Her balance as of July 31 was only $98,852.55.[8] According to Christina, she and Jean both knew the account contained insufficient funds, so she did not immediately attempt to negotiate the check. Aside from the checking account, Jean did

---

[6] Christina had asked Jean's doctor, again, to evaluate Jean's decision-making capacity for purposes of revising her will. The records from the oncology clinic from July 6 reflect that Jean had been diagnosed with pancreatic cancer, depression, anxiety, insomnia, and other conditions. They state that Jean was capable of only limited self-care and mostly confined to a bed or chair but alert and oriented with coherent speech and verbalized understanding of discussions. She was prescribed 10 milligrams of hydrocodone as needed but had "excessive sedation with medications." At the end of the note, the doctor wrote, "I believe that Ms. Ellis has medical decision making capacity, for purposes of revising her will."

[7] At trial, Christina testified that she could not recall what changes to Jean's will were being contemplated during this time period, and she insisted that the July 23 meeting was not about a gift for her. However, Ryan Barry testified that one of the topics to be discussed at the meeting was a gift to Christina.

[8] Mike's house in Soddy Daisy had recently been sold, in April 2015, and approximately $106,000 from the sale had been deposited in Jean's checking account. Also, a deposit of $60,000 from the family trust had been made on July 8, 2015.

not have "sufficient liquid funds" elsewhere to cover a transfer of this amount.  As such, Christina was admittedly "looking for a way to fund [the] gift" for a few days.

Records indicate that Sally Brewer and Christina spoke on the phone again on July 30, and this time, they discussed "a cognitive screening" for Jean and "gifting."  On July 31, Christina sent the following email to Ms. Brewer:

> Sally,
> Is there some kind of legal document that can be drafted to document her gift to me of $175,000 to purchase the house? She's giving me the money to buy the house.  I can't actually close on the house until the end of September.
>
> Also, Steve drafted a document to give her grandson, Nick, first option to purchase the house [on the farm].  Can you bring a copy of that in case she's ready to sign it?  It has to be notarized.

At some point, Mr. Barry discussed the gift with Jean by telephone and drafted a document to memorialize the gift.  Ms. Brewer scheduled a visit to Jean's house for August 5 for execution of the documents and a cognitive screening.

On the morning of August 5, prior to the meeting with Ms. Brewer, Christina signed and submitted an "Annuity Full Surrender Request" form to a local branch of Edward Jones, requesting the surrender of a Prudential annuity owned by Jean.  She signed the space designated for the "Party-In-Interest" as "Christina L. Duggan, POA."  The beneficiaries of the annuity were three of Jean's grandsons, but Christina did not inform them that she was cashing in the annuity.  The time-stamp on the facsimile shows that the paperwork was submitted at 9:28 a.m.

Later that day, Sally Brewer went to Jean's home to conduct a "mini cognitive screening" and assist Jean with the execution of the requested documents regarding the gift and the option to purchase.  Christina was also present at the home.  The document Jean signed that day stated:

> TRANSFER AND ASSIGNMENT
> In appreciation of the love and support shown to me by my niece, CHRISTINA DUGGAN ("CHRIS"), I, Jean R. Ellis, hereby transfer, give and assign One Hundred Seventy Five Thousand Dollars ($175,000) cash to CHRIS as an unrestricted gift.  As noted above, CHRIS has shown a great deal of love for me and she has spent countless hours and energy assisting me as my attorney-in-fact.  This gift is meant to show my appreciation for her love and support of me.

The next day, on August 6, Prudential issued a check payable to Jean for $126,281.09 for

the annuity. Someone signed Jean's name on the back and deposited the check in Jean's bank account on August 12. A few days later, once the funds were available, the check for $175,000 was deposited in Christina's bank account. After the check cleared, Jean's account balance as of August 31 was $39,125.12. Christina closed on the purchase of her new house on August 27. She paid the purchase price using the proceeds of the check for $175,000. She had not informed Rick or Jean's grandsons about the purchase of the house or the liquidation of the annuity.

A week after closing, Christina sent the following email to Sally Brewer:

Hi Sally,
How soon could you come up to Aunt Jean's? She wants to give my mom (her sister) some money and I need for you to verify this with her and notarize it as you did for me. Needs to be soon…she's getting weaker.

Ms. Brewer called Jean to discuss the matter on September 10, but Jean was "so indecisive" that Ms. Brewer recommended that she "put more thought into this and give us a call back when she had a clear vision on what exactly she wanted to do."

In November 2015, Jean revoked the powers of attorney granted to Christina and executed new documents designating Rick as her attorney-in-fact. Jean told Ryan Barry that her entire family had uneasy feelings about Christina and her activity as power of attorney. Jean said she was not one hundred percent certain that Christina was engaging in anything suspicious or unethical but that her family's uneasiness was enough to warrant a change. Jean reiterated that this was her own desire and not just that of her family.

Days later, Christina sent the following email to Ryan Barry:

Ryan,
Things are getting really ugly. Rick won't allow Mom or I to see Aunt Jean even though she wants us there. I saw her Saturday to take her checkbooks back to her and she had no recollection of changing her POA. I recorded our conversation so that you could hear it. She said she may have signed something that she didn't understand. Rick is questioning "how that house went down" meaning my house. I need to meet with you ASAP so that I can take appropriate steps. . . .

My urgent concern is that Rick won't allow Mom or I to see Aunt Jean, and the fact that she has no recollection of changing her POA just 2 days after doing so. Please give me a call. I know that I will need to pay for your time out of my own funds and that's okay.

Mr. Barry responded by explaining that he represented Jean, not Christina, and that he

could no longer discuss Jean's file with her.

Jean died on February 8, 2016. Ryan Barry left Chambliss Bahner on March 1. On March 22, other attorneys at Chambliss Bahner had a meeting with Rick and Jean's grandsons to discuss the administration of her estate and the family trust. Rick brought up the gift of the house to Christina and conveyed that Jean's family wanted the estate to pursue an action against Christina. Later that day, Greg Willett, one of the attorneys at Chambliss Bahner who attended the meeting, emailed Sally Brewer seeking details about the gift of $175,000 to Christina and asking her to prepare an affidavit about the circumstances surrounding the gift. Ms. Brewer prepared a timeline and memorandum in response. On March 24, Mr. Willett emailed Ryan Barry about the Jean Ellis matter, asking for more details about Mr. Barry's involvement with the gift and informing him that he and Ms. Brewer may both be witnesses in an upcoming lawsuit. Mr. Barry wrote that Ms. Brewer's timeline and notes "seem accurate to me." He added,

> The only thing that I would add is my involvement leading up to Sally's visit with Jean. Chris was certainly the one who made the initial contact regarding revisions to Jean's Last Will and potential gifting. Once she had made contact, we set the initial visit for Sally and I to go up and visit with Jean, which was subsequently cancelled (as noted on the timeline). When the issue was brought up again (by Chris), Sally and I followed our normal protocol, which involved: (1) me speaking with Jean over the phone to confirm that she wanted the revisions/gifting carried out, (2) me drafting the documents to carry out her wishes, and (3) Sally making a house-call to complete a cognitive screening before confirming one last time Jean was good with everything and then having her sign the documents. Other than my memory of these events, this is the protocol that Sally and I have followed on a number of house-call cases. In this particular case, I do not recall the date and time that I spoke with Jean, but I do specifically recall confirming her wishes over the phone prior to her signing the documents with Sally.

On March 29, Mr. Willett wrote a letter to the beneficiaries of Jean's estate (her sons and grandsons) detailing the facts surrounding the gift to Christina as described by Mr. Barry and Ms. Brewer. In conclusion, the letter stated:

> Based on the above facts, Steve Jett as the potential executor of Jean's estate does not feel that the evidence supports the estate bringing a claim against Chris Duggan for undue influence surrounding the August 5, 2015 gift to Chris. That being said, Steve, if appointed as the executor of Jean's estate, has agreed to file a motion with the Chancery Court asking that any claim that Jean's estate may potentially have against Chris Duggan be assigned to the remainder beneficiaries of the estate in order to allow the remainder beneficiaries to proceed directly against Chris Duggan if they so desire. . . .

- 10 -

Ultimately, a bank was appointed as executor of Jean's estate, and the bank retained Greg Willett of Chambliss Bahner as counsel for the estate. Chambliss Bahner notified the executor/bank that it would assist with all aspects of administration of the estate except for any claim against Christina for the gift made by Jean.

In September 2016, before any assignment occurred, Rick died. In April 2018, Mike died. On June 14, 2018, Jean's four grandsons filed a complaint in chancery court as "Assignees of the ESTATE OF JEAN R. ELLIS," naming as defendants Christina L. Duggan and Judy Morgan. The complaint states that the plaintiffs have standing to bring the claims asserted pursuant to the chancery court's order and "Assignment" filed in the estate case in May 2018. Those documents are not in the record before us. However, in their answer, Christina and Judy admitted that "[t]he estate's claims against Defendants Duggan and Morgan have been assigned to these Plaintiffs." The complaint alleged that a confidential relationship existed between Jean and Christina and that Christina had abused her position of confidence as fiduciary and attorney-in-fact. It alleged that Christina utilized fraud and undue influence in persuading Jean to make a gift to her of $176,000 apart from her will. The complaint alleged that Jean may have made the gift in reliance on a false representation that Christina would purchase a house as a place to care for Mike when Christina had no intention of caring for Mike at the house. The complaint further alleged that Christina used the power of attorney to write the check for the earnest money and request surrender of the annuity despite the document's prohibition against gifting. It alleged that Judy forged Jean's endorsement on the Prudential check before it was deposited in Jean's account to "fund" the check for $175,000. The plaintiffs alleged that this caused Jean and her estate to be wrongfully deprived of this money. The causes of action asserted included fraud and/or undue influence, breach of fiduciary duties, breach of power of attorney, tortious interference with contractual relations regarding the annuity, tortious interference with inheritance or gift, and unjust enrichment. The complaint alleged that Judy aided and abetted Christina in her actions. The plaintiffs sought to recover the $176,000 gift and their attorney fees.

Christina and Judy jointly filed an answer and a motion for summary judgment. They argued that "plaintiffs cannot establish undue influence for one reason," because Jean had independent advice regarding the gift. The trial court denied the motion, concluding that genuine issues of material fact remained for trial.

Trial was held over the course of five days in August and October 2019. The trial court heard testimony from twelve witnesses and received "approximately" 88 exhibits.[9]

---

[9] The 88 exhibits are not consecutively numbered but start with 1 and end with 102 with inexplicable gaps in between. It appears that the parties presented a binder of "premarked" documents to the trial judge at the beginning of trial along with "a color-coded list" of exhibits with the trial briefs (which is not part of the record on appeal). Without proceeding in order, they attempted to check off documents as exhibits if they were discussed and/or admitted at trial. During the five-day trial, the trial judge attempted to clarify

Christina had acted as attorney-in-fact for Jean numerous times between December 2012, when Jean executed the documents, and November 2015, when she revoked them. The power of attorney remained in effect at the time of the alleged gift in July and August 2015. As such, counsel for Christina conceded that a confidential relationship existed between Jean and Christina.

Christina maintained that Jean wanted to make a gift to her of $176,000 to purchase the house. Christina acknowledged that she completely filled out the $1,000 check for the earnest money, but she said she did so at Jean's direction after they toured the house together. She admitted that the check for $175,000 was also in her handwriting with the exception of Jean's signature, but again, Christina testified that Jean directed her to prepare the check. Christina testified that she and Jean both knew Jean's checking account had insufficient funds to cover the check for $175,000 and that they "were going to have to move money, which is why I held the check." Christina said she was "looking for a way to fund [the] gift" and had a discussion with Jean about where to get the funds. She testified that the Prudential annuity "seemed to be the easiest option" and that there were really no other alternatives. According to Christina, Jean told her to call trustee Grady Williams to ask him if the Prudential account would be acceptable to use. Christina testified that she called Mr. Williams and that he said it was fine to use anything outside of the trust. Christina testified that she did not ask Mr. Williams to give her money from the family trust to cover the gift.

Christina said she did not speak with anyone else about how to fund the gift, such as Ryan Barry, Sally Brewer, Jean's sons, or Jean's grandsons who were the beneficiaries of the annuity. She acknowledged that the annuity surrender request submitted to Prudential contained only her signature with the designation "POA." However, she again insisted that Jean "directed that action." Thus, she claimed that she had used the power of attorney to request the liquidation of the annuity to fund the gift "at [Jean's] direction." Still, Christina claimed to have no knowledge as to how the Prudential annuity check was deposited in Jean's bank account. She agreed that the endorsement on the back of the annuity check did not appear to be in Jean's handwriting. However, Christina denied

which documents had actually been admitted. At the end of trial, he asked the parties to confer and come to a consensus concerning which documents had been admitted. They submitted a five-page document attempting to resolve the matter, designating certain exhibits or selected pages of exhibits as admitted. After the notice of appeal was filed, this Court sent the record back to the trial court noting that many of the exhibits did not have original stickers from trial and there were exhibits either missing or present but not listed on the volume index. As a result, the parties' attorneys met in court (apparently without the trial judge) and announced a "Stipulation" on the record that certain numbered exhibits were in fact the originals introduced at trial. However, a review of the transcripts reveals that some of these exhibits were never formally admitted by the trial judge during trial. In an effort to provide the parties with finality after years of conflict, we have carefully reviewed the nine volumes of exhibits on appeal in a process that could aptly be compared to an archaeological dig. We have attempted to make sense of the parties' inexpiable practice in the trial court. However, we caution the parties that we may not be so forgiving and accommodating in future appeals.

giving anyone authorization to sign and deposit the check and insisted that she did not know how it came to be deposited. She did admit that she deposited the check for $175,000 in her own bank account five days after the deposit of the annuity check in Jean's account. She also conceded that the endorsement on the back of the annuity check was written with a backward slant and that her mother Judy writes with a backward slant.

Regarding the reason for the gift, Christina was asked if "the origin of this discussion about buying a house" was so that there would be a place for her to take care of Mike. She said, "That was part of it." She claimed that she and Jean spontaneously visited the house for sale in their old neighborhood "just kind of for fun." She said when the house sold, Jean "felt bad that she hadn't bought it" for her, and Christina told Jean, "There's no reason for you to buy a house for me, I have a house." Christina said she "assured [Jean that] there was no reason for her to feel badly at all. I never expected anything." She admitted that Jean had become worried about Mike again during this timeframe and what would happen to him if she passed. Christina said it was her understanding that Mike would live either with her or with Rick or that Rick would arrange for him to live in a facility. If Mike lived with Christina, she planned to keep working but to continue having caregivers for Mike at her home. She said at the time of the gift, there was "a realistic possibility" that Mike would live with her. She said Mike ultimately never spent a night in the house that Jean purchased because he experienced a sudden health issue about a week after closing such that he was hospitalized and then required care in a facility setting with staff onsite. However, she said a caregiver did bring Mike to see the house right after closing and that he saw the bedroom that would have been his. At the time of trial, Christina still owned the house purchased by Jean in addition to the house that Christina previously owned, but she was living at the house purchased by Jean.

When asked why she wanted to obtain a legal document regarding the gift, Christina said "for assurance, validation," and she "did want protection." She said, "I knew that my family would probably question her capability to make that gift." Christina said when she spoke with Sally Brewer on the phone, she told Ms. Brewer to question Jean to determine if she was "cognitive enough" to make the gift and doing it of her own free will. Christina said she was at Jean's house when Ms. Brewer came on August 5 out of "courtesy" and met Ms. Brewer at the door. However, Christina claimed that Ms. Brewer and Jean went "behind closed doors" for their discussion, on the back porch, and that she remained "in a totally separate part of the house." Christina said she did not go out onto the porch with them until after their private meeting had ended and the documents had been signed. She estimated that the meeting lasted 30 to 45 minutes.

As for Jean's mental and physical state at the time of the gift, Christina testified that Jean was gradually getting weaker but that her mental state "fluctuated." She said Jean had "more good days than bad." She admitted that on bad days, Jean had more fatigue, pain, and confusion, and that it was more difficult for her to think quickly and clearly. On the other hand, she said that on good days Jean was very sharp and able to recall

information and give her opinion on things very quickly. Christina described Jean as strong-willed and said no one could get her to do anything she did not want to do. Although Jean had been prescribed hydrocodone as needed for pain and Xanax as needed for anxiety, Christina testified that Jean did not like the way pain medicine made her feel sleepy or groggy, so there were more days when Jean did not take pain medication than days when she did.

Christina said she and her mother spent the most time with Jean in the summer of 2015 aside from the caregivers and that she saw Jean two or three days a week. She said they continued to go on outings but that Jean was in a wheelchair. Christina said she and her mother often went shopping with Jean and that Jean was "very conservative" with her spending and frugal in her purchases for the most part. She explained that Jean loved to shop at TJ Maxx or Ross rather than department stores and that she knew the schedule for new deliveries and would be there to find the best buys. However, she said that Jean would return at least fifty percent of the items she purchased. Christina claimed that Jean would buy things for her or Judy only every now and then, like a bracelet or item of clothing.

Christina acknowledged that just days after the closing on her house, she emailed Sally Brewer asking her to come "verify" a gift to Judy. According to Christina, Jean brought up the idea of buying a house for Judy. Christina went with Jean and Judy to look at a house for Judy, but she said Jean decided not to buy it. Christina denied that she had ever pressured Jean to buy a home for Judy.

Judy also testified. She was about fifteen years younger than Jean and age 73 at the time of trial. She had worked part-time at a fast food restaurant until the age of 62 when she "had to go on disability." Judy confirmed that she and Christina spent the most time with Jean apart from her caregivers. She also agreed that one of Jean's biggest fears was about what would happen to Mike when she died. However, Judy testified that she and Jean "never spoke about the house" for Christina.[10] She added, "[T]hat was all Chris and Jean." Judy had overheard Christina and Jean "talking about a home to move Mike in[.]" Judy claimed that Mike and Christina "had always been really close" and that "Chris

---

[10] Interestingly enough, Judy said she *did* ask Jean to give her grandson Nick the house where he was living on Jean's farm. Nick lived next door to Jean and in lieu of rent he would mow Jean's yard and take care of things around the property for her. Judy testified,

> Yeah, Nick was up at the house one day mowing [the] lawn or something, and he came in to the den where Sis and I were, and I asked him, while we were all three there, I said, Nick, do you still want to – would you like for [] Jean to give you that house? And he said, Well, yeah, I'd like that. And I said, Well, let's ask her, you know, while we were all three there. And so I said, Sis, would you like to just go ahead and give Nick the house that he's been living in?

Although Jean did not gift the house to him, Judy said, "I asked her about Nick because I just wanted him to have a house because he lived there so long, I didn't see why she wouldn't give it to him."

- 14 -

wanted to take Mike to live with her . . . in a home that Jean would purchase." She said the plan was for Jean to give the money to Christina to buy a house where she would live with Mike. Judy said she went with Christina and Jean when they looked at houses together but never saw Christina pressure Jean into making the gift. Judy also denied that she ever asked Jean for a house for herself. According to Judy, after Jean bought Christina a house, Jean simply said "out of the blue" one day, "Judy, Would you like for me to buy you a house, too?" Judy said she initially declined and said she didn't need another house but then said "if you really wanted to buy us a house, [] that would be really nice." Judy and her husband and Christina went with Jean to look at a house, but Jean did not like it. According to Judy, Jean never discussed the issue again. (Christina emailed Ms. Brewer about a gift to Judy in September, and her power of attorney was revoked in November.)

Judy agreed that Jean was sometimes confused during the summer of 2015 but said she had good days and bad days. Judy described Jean as "always an anxious, nervous type person" but said she was very strong-willed and that it was impossible to get her to do anything she did not want to do. She said Jean was "very tight with her money."

Judy was shown the Prudential annuity check for $126,281.09 and agreed that it appeared to have been addressed to Jean at her home address. She admitted that Jean's endorsement on the back did not look like Jean's usual signature. However, Judy denied that she signed Jean's name to the back and deposited it in Jean's account. Judy insisted that she had never seen the check until it was shown to her by one of the attorneys in this litigation. Judy claimed that she did not know about the liquidation of the annuity until the week before her deposition and that she was not at all involved with the resulting check. She said she knew about the check to Christina for $175,000 but not that there were insufficient funds to cover it.

Two of Jean's caregivers testified as well. The first was Michelle Smith. She was employed by a caregiving agency and initially hired by Rick before Christina was given power of attorney for Jean in 2012. She served as a caregiver for Jean until she died in 2016. Ms. Smith and the other caregiver, Rose Melton, typically worked twelve-hour shifts, but sometimes, they worked longer hours and were at the home together. Ms. Smith testified that Christina and Judy would come to Jean's home a few times a week to visit Jean and also take her to doctor's appointments and for outings. She agreed that Judy and Christina were there more than anyone besides the caregivers. Ms. Smith testified that Christina and Judy were really nice to Jean and would help her and do things for her, but if they got upset or something did not go "their way," their personalities would change and they would be "kind of short or cold." She also said that Judy would take things from Jean's house once or twice a week and say that she was taking it to her church, such as dishes, curtains, furniture, or clothing. Ms. Smith had also overheard Christina and Judy talking with Jean about money, including small gifts or donations to charitable events and sometimes "gifts or something they would need." She said that caregivers would go with Jean on her outings, and just about every time she went shopping with Christina and Judy,

they would say they needed something and Jean would buy it for them.

Ms. Smith said that Christina and Judy sometimes asked the caregivers to leave the room when they had conversations with Jean. Still, she did observe some "discussions" during the summer of 2015 about Jean buying a house for Christina, although she did not consider what she saw to be "pressure." Ms. Smith explained that Christina was going to let Mike live with her in the new home and was looking at houses that would better suit him. Ms. Smith was present with Jean at two of the houses they visited. At the first house, near where Jean grew up, she recalled Christina talking about Jean's childhood and saying that she could come there to reminisce about her younger days. She said there was some discussion about Christina selling the house that she already owned, but Christina said "there was plenty of money. Not to worry about it." When they toured the house that Christina eventually purchased, Christina was pointing out features that would make it a great place for Mike. Ms. Smith said, "I felt that she was trying to coach Jean into buying it for her by using Mr. Mike." She also recalled Judy making statements to Jean about how Christina had worked hard for Jean and really deserved a house.

When asked about the likelihood that Mike would have lived with Christina, Ms. Smith responded, "I don't feel like Mr. Mike would have went willingly. I don't feel like he wanted to be there. He always stated he wanted his brother to take care of him if something happened." She said Mike had expressed that sentiment many times before the summer of 2015. When asked if Christina knew this, Ms. Smith responded, "I think she did, yes." She explained that Mike would get upset when Christina was around. She said if they pulled in the driveway and saw a vehicle belonging to Judy or Christina, Mike would curse or stomp the floorboard or throw his drink. He would say he did not want to go inside and "didn't want to put up with them today." She said Mike became agitated when Christina and Judy tried to help with his care and that he would not let them touch, clean, or wipe him without a fight. When asked if Christina knew that Mike would not want to live with her, Ms. Smith said it would be "kind of hard that she wouldn't, considering the fits that he threw." She thought it was obvious from his reactions to her. Ms. Smith agreed that Jean was concerned about Mike having enough money to afford the kind of care that he was going to need if he outlived her. However, from Ms. Smith's perspective, the discussions between Christina and Jean did not take into consideration how Mike felt because of his dementia, and Jean seemed to think she "could just give Mike to Chris."[11] Ms. Smith did not think Mike comprehended that he would be expected to live with Christina, but she said Christina never did anything to correct Jean's misperception or point out that Rick had power of attorney for Mike, not Christina.

Ms. Smith did observe what she deemed to be "pressure" that was put on Jean to

---

[11] Ms. Smith believed there had always been "tension" in the family and that Christina and Judy did not get along well with the rest of the family. She said their interactions at large family gatherings were "phony" and "all put on for Jean to make her happy because they were all together."

buy a house for Judy.  She said after Jean purchased the house for Christina, "they started in on trying to get Jean to buy Judy Morgan a house."  During one conversation she recalled, "Jean got very upset because she felt that she didn't have enough money to buy Judy Morgan a house because she just got through buying Chris Duggan's house."  She remembered Jean saying, "I can't afford to buy you a house right now, Judy.  I just bought Chris one."  She said Christina told Jean "not to worry about it; that there was plenty of money."  She said they discussed it a little more and then Christina got upset and said that Judy would have to talk to Jean about it because "[s]he tried and wasn't getting anywhere."  Ms. Smith said Christina did not visit Jean for a week or so afterward.  From what Ms. Smith observed, Jean felt isolated and as if they were not coming around because she did not do what they wanted.  She said the whole situation made her feel sad for Jean and that she eventually reported her observations to her employer, and Rick and Michael, "because I couldn't stand to watch it no more."

As for Jean's physical condition during the summer of 2015, Ms. Smith testified that Jean was taking hydrocodone every four to six hours depending on her pain level.  She was not aware of any days when Jean would not have had any hydrocodone, like Christina had described.  On an "ordinary day," she said, Jean would have had at least three to four hydrocodone pills.  Ms. Smith said Jean's pain was getting worse during that period and she was taking more and more medicine, which made her drowsy, slow, and sluggish, with slurred speech sometimes.  Ms. Smith felt that Jean wanted to please everyone more when she was medicated.  She testified that Jean would get upset when there were discussions about her will or her property to the point that she would sometimes have panic attacks.  She said Jean would cry and have shortness of breath and "get herself all worked up."  According to Ms. Smith, when Christina and Judy knew that "this was going to be the topic" or that there would be a meeting, they would give her instructions about medicating Jean in advance.  Judy would call and instruct Ms. Smith to give Jean either a Xanax to calm her so she wouldn't get so upset or a hydrocodone if she was hurting.  According to Ms. Smith, this would change Jean's mood from alert and awake to sleepy, groggy, and "willing to please."  Ms. Smith sometimes felt that the dosage of hydrocodone she was directed to give Jean was too strong, but she said she was instructed to give it to Jean 30 to 40 minutes early "to keep it in her system."

Ms. Smith had driven Jean and Judy to Jean's doctor's appointment in early July 2015, when Christina had requested that the doctor evaluate Jean's decision-making capacity for changing her will.  Ms. Smith testified that Judy was "prompting" Jean on the way, reading questions from a book and asking Jean to answer.  For example, Ms. Smith recalled her asking Jean to name the president and identify colors.  She added, "It was like she was getting her ready to take the test before we got there."  From what she overheard during discussions, one of the changes to the will that was being contemplated was "a percentage" that Christina would receive.

The second caregiver to testify was Rosetta Melton.  She was also employed by a

caregiving agency and had worked with Jean and Mike for about two years. Ms. Melton mostly worked the night shift but also worked during the day sometimes with Mike. She similarly testified that Mike did not want to be around Christina and Judy. She said he would get mad and not want to go home when he saw they were there, but once he went inside, he would generally act fine "in front of them." When they left, he'd say he was glad they were gone. Ms. Melton also understood that Mike wanted to live with Rick if Jean passed away.

Ms. Melton was present at Jean's home on August 5, 2015, when Sally Brewer brought the documents for Jean to sign. She testified that Christina was also present when Ms. Brewer arrived, along with Judy, Mike, and Jean. Ms. Melton recalled helping Jean out of her recliner and said Jean and the others went out onto the sun porch together. She recalled that Jean was sitting in a rocker, Ms. Brewer was in the middle of the porch, Christina was on the side, and Judy was sitting toward the windows. Ms. Melton said Christina came in from the porch and asked her to take Mike outside. As Ms. Melton was going out with Mike, she saw Christina go "[b]ack out there." Because Ms. Melton was outside for the remainder of the visit, she did not know who remained on the porch during the meeting. However, Ms. Melton said Judy and Christina were out on the porch with Jean and Ms. Brewer when she went outside, and she never saw them leave the porch.

Ms. Melton testified that shortly after the August 5 meeting, she began to get telephone calls from Judy every day asking her if a check had arrived in the mail. When a check arrived a few days later, Ms. Melton told Judy about it, and she was asked to open it. Ms. Melton said she did so and saw that it was a check payable to Jean for "120-something thousand dollar[s]." She said Judy asked her to bring the check and meet her in Soddy Daisy. According to Ms. Melton, she met Judy in a parking lot and delivered the check as instructed, and Judy told her "not to tell Rick or anybody about it." Ms. Melton testified that she did not tell Jean about the check or show it to Jean before she left, so Jean did not write on the check or do anything with it while it was at her house. To her knowledge, Jean never saw the check. Ms. Melton did not write on the check either.

The next witness was Grady Williams. He had worked as a certified public accountant at a local accounting firm for 47 years. Mr. Williams had moved next door to Dave and Jean Ellis in 1960 and knew all the family members except Judy. When asked to describe Jean, he said:

> Jean was a person that changed her mind a lot. Today she wanted to do this. Tomorrow she wanted to do something else. Change her will, or change this, change that. She was a very changeable person; a person that kind of listened to everybody and probably whoever the last person she talked to was the thing that she was interested in and okay with, but she was a very changeable person. . . .

He also described Jean as "very, very frugal" and said she "watched her money."

Mr. Williams and Jean were co-trustees of the family trust created by Dave's will. He served as co-trustee without any compensation. Mr. Williams explained that the family trust was for the benefit of Jean during her lifetime and then the residue would go to Dave's heirs (but not Christina or Judy). The trust paid for the caregivers for Jean (and Mike) and for other expenses they had. Mr. Williams testified about the meeting he had with Christina and Mr. Jett in November 2013 regarding the need to conserve Jean's resources due to the extensive medical care that was being provided on a 24/7 basis. He testified that the distributions from the trust were not very large in 2013 and 2014 and were mostly requested by Jean, but this changed in 2015. The expenses were "very, very high," and the trust was making larger distributions for Jean's benefit, at Christina's request. For instance, on July 8, 2015, just before Jean purchased the house for Christina, the trust distributed $60,000 for Jean. Between July 8 and November 3, the trust distributed a total of $160,000 for Jean.

Mr. Williams described one particular telephone call from Christina in August 2015 in which she requested funds from the family trust. He said Christina told him that Jean was going to make a gift to her of $175,000 to buy a house but that Jean did not have that much money in her personal account, so Christina wanted to know "could she have – could the trust make up the difference." Mr. Williams said he told her "no, the trust could not." He said this would have been "a substantial amount of money" and that he did not consider it a proper distribution from the trust because it did not have anything to do with the maintenance or upkeep of Jean or Mike. He did not feel that it was appropriate to distribute money for Jean to make a gift. As such, Mr. Williams told Christina "that she would have to get the funds somewhere else." Mr. Williams never had a conversation with Jean about the gift. However, Mr. Williams was generally aware of Jean's estate and was of the opinion that $175,000 would have been "a large gift from her estate." He said "with an estate no larger than Jean's was" this would have been "a very, very substantial gift." He reiterated that the November 2013 letter had already recommended selling various assets because they did not know how much money she would need for her care, which was costing about $20,000 per month.

Jean's grandson Hunter (Rick's son) also testified. He was 35 years old at the time of trial. Hunter testified that once Christina was given power of attorney, she was on a "power trip." He felt that Christina and Judy acted like they owned Jean's house and tried to keep everyone else away. Hunter testified that Mike did not like to be around Christina and Judy and would get frustrated when they were there. He said Christina and Judy tried to "baby" anyone who was sick, including Mike, which upset him. Hunter could not say for certain where Mike wanted to live if Jean passed away, but, he added that Mike loved being around Rick and did not enjoy being around Christina.

Hunter did not know that Jean had bought a house for Christina until after it was

- 19 -

purchased, and when he heard, he did not believe it. He said he went to visit Jean on her birthday at the end of October, and there was "an offer made" of a house for him as well. Hunter told Jean that he was not going to talk about that because he was there to celebrate her on her birthday. He testified that he was "a little disgusted" by it, not because of Jean, but because of "what she was having to go through, as much as she was already suffering in her last days of life, and how she was being treated." He said, "It was my understanding that Chris was telling her that she was rich and had plenty of money for this." He said once Rick was named power of attorney, the caregivers were told that Jean could only be with Christina and Judy if someone remained in the house to observe. Hunter had reviewed Jean's bank statements and calculated that $193,000 was spent on caregivers in 2015.

Hunter testified about the family meeting at Chambliss Bahner after Jean died, when Rick conveyed that the family wanted the estate to pursue an action against Christina, but the attorneys said they had no chance of winning. He said the attorneys later provided a letter summarizing their position. He said the beneficiaries were provided notes created by Sally Brewer that appeared as if they had been made contemporaneously, on the date of her visit with Jean, but they discovered after a subpoena was issued that the notes were actually created eight months after the visit, after Jean died and after the initial family meeting. They also discovered that Ms. Brewer's original memorandum contained an additional sentence that was deleted before it was provided to the beneficiaries: "Ms. Ellis did exhibit anxiety, which may have contributed to her indecisiveness."

Hunter said the beneficiaries were informed that the lawsuit could be assigned to them but that they would be required to assume the costs of bringing the lawsuit. Hunter testified that he and his brother Nick had incurred substantial attorney fees and costs in connection with the litigation. At that point, his counsel informed the trial judge that he would not pursue the issue of attorney fees any further based on his understanding that the trial judge intended to defer any further action regarding attorney fees and appoint a special master if they were in fact awarded. The trial judge responded, "You got exactly as far as you need to go. He said there are fees. If ultimately fees are awarded, we will take that up post-trial."

Rick's other son, Nick, also testified. He was age 33. Nick had lived in the small house next door to Jean and saw her four to five times per month. Nick testified that in mid-July 2015, Christina called him and said that lawyers were coming to Jean's house to make changes to the will. She told him that one of the issues was whether he would get the house where he was living. Christina reportedly told Nick that he needed to go to Jean's house and talk to Jean about whether he wanted the house. Nick testified that he told Christina that he would be uncomfortable doing that, and she responded, "Well, just do what I do first, give her a hydro." Nick said when he was at Jean's house a few days later, Judy brought up the subject about his house, saying, "Sis, isn't there something you want to talk to Nick about?" Nick testified that Jean indicated to him that she wanted him to have the house as a gift. He said Judy "chimed in" and said that Jean was buying a house

for her too. Nick said he did not learn about the house for Christina until September, when she called and asked him to come to her new house to get a mattress and take it to Jean's house for Ms. Melton. When Nick asked her for clarification, she said, "Aunt Jean bought me a house." He said he did not know until he saw Jean's will that he was really only getting an option to purchase his house.

Mike's son, Michael David Ellis, II, also testified. He was a plaintiff individually and on behalf of his son, Will, age 17. Michael was Jean's oldest grandson. He remembered Jean showing an "intoxicated-type effect" when she was taking her nerve pills and pain medication. He said the medication would also impact her indecisiveness so that she "would just go with the flow" and be agreeable to anything. Michael said after one of the caregivers told him about Jean's gift to Christina, he confronted Jean about it, and she seemed surprised. He investigated the records of the county property assessor and then knew for certain that it was true. Michael said he had heard that the house was proposed as a place to care for his father Mike in the event of Jean's passing. He agreed that Jean was always very protective of his father and fearful of what would happen to him when she passed. However, he said that his father had always disliked Christina, even before he had dementia. He said Mike tolerated Christina out of respect for Jean but disliked Christina and Judy a lot and made comments as soon as they left. When asked it if was possible that Christina had no idea about Mike's true feelings, he said, "it would have taken somebody who really had their head in the sand" and was just "oblivious to [the] facts." He said Mike would "put on his game face" around Christina but that his true feelings would still "shine through." He said everyone in the Ellis family knew Mike felt this way.

Michael had discovered the liquidated Prudential annuity after Jean's death. He also testified about the meeting with the beneficiaries at Chambliss Bahner when "everybody at the table -- all the Ellis[es]," expressed their concern about the gift and their desire for the estate to pursue a claim against Christina. He said Mr. Jett would not serve as executor if they pursued the claim, nor would Chambliss Bahner represent the executor/bank with respect to any claim against Christina. Michael was represented by separate counsel and had incurred attorney fees and expenses in pursuing this litigation against Christina.

Jean's long-time attorney, Stephen Jett, also testified. He described his involvement with Jean in various transactions over the years before he retired in March 2015. Although there had been numerous communications between Mr. Jett and Christina regarding Jean, Mr. Jett said he had never represented Christina individually or her business. He did agree that Christina and Chambliss Bahner had a "business referral relationship." When he retired, Mr. Jett had suggested that Jean work with associate Ryan Barry. Mr. Jett testified that Mr. Barry had been involved in discussions about Jean prior to his retirement, but he could not recall Mr. Barry ever meeting Jean in person before he left. Mr. Jett said he attended Jean's funeral and learned about the gift to Christina when speaking with one of Jean's family members. Although he had retired, Mr. Jett had planned to serve as executor

of Jean's estate until he learned that the beneficiaries wanted to pursue a claim against Christina. Mr. Jett said he had no desire to get involved in something that complicated and time-consuming. He said the next successor executor in line was the bank that was ultimately appointed as executor.

Ryan Barry testified as well. He had started at Chambliss Bahner during the summer of 2011 right after graduating from law school. At the request of Mr. Jett, he had drafted Jean's revised will and power of attorney documents in 2012. He testified that Jean initialed the provision in the power of attorney stating that noncharitable gifts were not allowed to be carried out by the attorney-in-fact. Initially, Mr. Barry testified that he first "met" Jean when he drafted these documents in 2012 and that he would "meet" with her once or twice a year thereafter as various issues arose. However, Mr. Barry later clarified that when the subject of the gift arose in 2015, he had "spoken with" Jean before, but he could not remember if he had ever met Jean "face to face." Mr. Barry conceded that he did not know Jean extremely well personally. He said he was "not intimately personally, you know, knowledgeable of her situation or anything to that extent." He "vaguely" remembered the "concept" of the November 2013 letter regarding the need to conserve Jean's assets but did not remember the document specifically.

Mr. Barry testified that Jean became "much more active in 2015" and began to make several inquiries regarding her estate plan, but he acknowledged that most of the contact was "initiated by" Christina. He said the two main changes to her estate plan were the right of first refusal to Nick and the gift to Christina. Mr. Barry said he had represented Christina "as attorney in fact through [Jean's] file" but not individually. He had spoken with other individuals on the firm's estate and trust team about Christina as an option for a caregiver.

During his deposition, Mr. Barry's recollection of his contact *with Jean* was quite limited. He could not recall when he first heard that there was a gift being contemplated, and he did not specifically recall Christina's email to Sally Brewer about the gift. When asked at his deposition whether he remembered any discussion about the money being used to purchase a house, he said, "I vaguely remember purchasing a house being out there." Regarding the extent of his conversations with Jean, he testified during his deposition:

Q. Do you know – when you talked with Jean – this indicates that you actually had a telephone conversation with her.
A. Several, yeah.
Q. Well, there's only a reference to one. I've seen no record of any other – I'm talking about in this timeframe. I see only – there was a reference somewhere to you talking with her. I think maybe it was in Exhibit 38 that you said you actually called her up.
A. I do recall talking to her on the phone, if that's the question.
Q. Right. That's right. Do you recall the content of the conversation?
A. What her desires were.

Q.      All right. *And her desires were what?*

*A.      I don't recall.*

Q.      Do you recall whether she mentioned anything to you in that conversation about a house – using the money for a house?

A.      Are we talking about my conversations with Chris or with Jean?

Q.      Jean.

A.      And you're saying she was talking about a house?

Q.      I was asking, Did you have any conversation with Jean where Jean was talking about the money being used to buy a house for Chris to keep Mike.

A.      I don't recall.

Also, during his deposition, Mr. Barry testified that he sent Sally Brewer to Jean's house to do a cognitive screening before Jean executed the documents "to be extra sure" that Jean "had the capacity to execute [the] documents." He said he did not give Ms. Brewer any direction or instruction about investigating whether there was undue influence on Jean. When asked during his deposition if *he* had done any independent investigation of undue influence himself, Mr. Barry said yes, he did, "[t]hrough the interactions I had with Chris and with Jean[.]" Counsel asked Mr. Barry if this conversation with Jean happened around August 3, when he had talked with Jean by phone and she told him that she wanted him to draft the documents. Mr. Barry said, "That was one conversation, yes." Counsel then emphasized that if there were any more conversations that occurred around the timeframe of the gift, he wanted to hear about them. Mr. Barry said, "I don't specifically recall what we talked about. I know there were conversations, but that was not the only time I spoke with [Jean] within the timeframe of this conversation." Mr. Barry was again asked to describe any other conversations he had with Jean between July 31, when Christina emailed Ms. Brewer about the gift, and August 17, when the "gift check" cleared the bank. Mr. Barry admitted that he could not specifically recall any other conversations with Jean.

At trial, however, Mr. Barry recalled significantly more about his interactions with Jean. Mr. Barry said he and Jean had "several conversations over the phone." He remembered that he had an in-person meeting scheduled with Jean for July but that it was canceled. After it was cancelled, he said, he "scheduled several phone conferences with her to go over these different items." He testified that he recalled three phone calls with Jean before the gift transfer document was executed. He said the first call occurred sometime after Christina's July 7 email to Ms. Brewer requesting a meeting regarding changes to Jean's will but before she canceled the July 21 meeting. The second phone call he remembered was after Christina's July 31 email to Ms. Brewer asking for some kind of legal document regarding the gift but before Ms. Brewer went to the home. The third was "a brief conversation" by phone while Ms. Brewer was at Jean's home on August 5. However, Mr. Barry admitted that he did not have any notes or memoranda that related to the content of these phone conversations. He initially said he was "sure" he had some sort of billing entry for his conversation with Jean. Later, however, he conceded that billing

- 23 -

records from Chambliss Bahner showed three entries on Jean's file by Ms. Brewer in July 2015 but no entries by him. He explained that he did not always bill all of his time, especially for phone calls.

Mr. Barry also recalled at trial that Christina was the one who initially brought the gift to his attention. He remembered Christina emailing him records from the oncology clinic regarding Jean's decision-making capacity and reviewing them briefly. He said he was not concerned by the fact that someone holding power of attorney was contacting the firm about a gift to herself any "more than normal." He said his firm had policies in place for gifting or revising estate plans to address two main areas – competency and ensuring that "the individual is carrying out what they want to carry out." He said they ensure competency typically by speaking with the individual to be sure he or she can provide general information, and in this case, he "had the luxury of having a certified dementia care specialist" on the team, meaning Sally Brewer. Mr. Barry was asked if undue influence would fall under the second category. He said, "Knowing what undue influence is, I would say it would generally fall under that. I don't mentally compartmentalize it as I'm going to test competency and undue influence. In my mind, it's more I'm making sure the individual is carrying out their specific wishes and they understand what is going to happen when they do carry out their specific wishes." He said "whether it's [Jean] or anyone else making a significant gift," it would generally involve making sure it is what Jean "wants to do" and that she can explain what she wants to do and understands what they are discussing and what effect it is going to have on everything.

Mr. Barry confirmed that he spoke with Jean specifically regarding the gift to Christina "over the phone." He said some of his goals in making the call were to ensure "this was [Jean's] intent" and "what she wanted to do" and "to confirm [that Jean] was acting on her own accord and that she knew what she was doing." He said, to his knowledge, the phone conversation was only between Jean and him and that he had no reason to believe that someone was "listening in." However, he could not be certain that Christina or Judy was not sitting with Jean during their conversation. Mr. Barry said the conversation involved review of the estate planning documents Jean had in place to determine if she wanted any revisions to trustees, executors, agents, or amounts. He said he also spoke to Jean about the gift and the right of first refusal. He said Jean confirmed that she did want to go forward with the right of first refusal Mr. Jett had drafted and the gift to Christina. Mr. Barry said he would have briefly discussed the "Transfer and Assignment" document he drafted for the gift and said "generally what it represented and what it stood for to her."

When asked if he discussed with Jean any of the *consequences* of the gift, Mr. Barry said that his "process, in general," involves making sure the person making a gift is doing what they want to do, meaning, knows the facts regarding what they want to do, the tax implications, and the fact that the person cannot "undo that once it's done." So, Mr. Barry said that with Jean, "my conversation generally involved, first and foremost, what do you

- 24 -

want to do; and [Jean] explained that she wanted to make this particular amount to [Christina] as a lifetime gift."  Mr. Barry said he "briefly mentioned to her that she would not owe any gift or estate tax."  Finally, he mentioned "the general fact that there are no take backs when you do lifetime gifts."  Mr. Barry said he did not recall "specifically going through the dollar-for-dollar consequences of what's going where," but he did recall saying, "What do you want to do? Here are the tax implications, and you do not get to undo this once it's done.  This is not part of your estate plan anymore.  It's done once it's complete."

When asked if he knew the nature and extent of Jean's estate at the time of the gift, Mr. Barry said, "Just, again, the general – there's several million in play out there from the husband's estate and from her estate and real estate and different assets."  It was not his understanding that the gift would render her insolvent, but he admittedly did not know "specific dollar figures" or the amount of cash in her accounts.  He knew that Jean's caregivers were costing a significant amount but did not know how much.  When asked if Jean understood the "nature and extent of her bounty," he said she "seemed to" and that he did not have any reason to believe that she did not.  He said, "From what I recall, she knew generally what assets she had and what values they had associated with them."  He said he "didn't discuss specifically how the gift fit into the estate plan from the standpoint of the documents and whatnot, but I will say again that part of my discussion on the gift was, Here is what you want to do, confirming that, tax implications, and then, You don't get to take this back."  He said, "[W]hen I say I made sure that she was knowing what she wanted to do, that included not only what do you want with respect to amount and who, but, also, here is the tax implication and you know that there's no take backs when we're done with this."  Mr. Barry was asked about his deposition testimony that the content of his conversation with Jean simply consisted of "[w]hat her desires were," and when asked what those desires were, he had responded, "I don't recall."  Mr. Barry said it was true that he could not recall at the time of his deposition.

When questioned about the circumstances surrounding the gift, Mr. Barry said he was not aware that a check for $175,000 had already been drafted on or about July 30, before Christina contacted the firm about the gift.  He did not know Christina was holding the check because there were insufficient funds in Jean's account.  However, he said he would have most likely acted the same way if he had known about it, "as long as [Jean] still convinced me that she was competent and knew what she was doing and understood what was going on."  Mr. Barry did not know about the $1,000 check for the earnest money either.  He also did not know "where the money came from" to cover the gift and did not know that Christina had liquidated Jean's annuity using the power of attorney.  Again, however, he said he "would have carried out the same thing I carried out, making sure that [Jean] was the one doing it, that she understood what was going on, that it wasn't anybody else but her."  Mr. Barry did not explain to Jean how the transfer would impact any other beneficiaries of her estate other than his statement that she "can't undo it once you've done it."  He did not know if anyone else in the Ellis family was aware of the gift.

Mr. Barry said that after speaking with Jean on the phone, he did not have concerns about her mental capacity to make a gift, but he "took one extra precaution" by sending Sally Brewer out "to complete one of her dementia care specialist workups simply to make extra sure that she was competent and mentally sound." He said this was a regular occurrence in situations where the client's family situation is less than cordial. Mr. Barry said he directed Ms. Brewer "to do a cognitive screening" and gave her discretion as to whether Jean could sign the documents, so if she did not feel that the cognitive screening went well then, she could bring the documents back unsigned. However, he confirmed that he "did not specifically give her instruction on undue influence," he "simply told her to do what we always did." Mr. Barry said Ms. Brewer called him from Jean's house because Jean wanted to confirm that Grady Williams "was indeed still over her affairs." Mr. Barry said he did confirm to Jean over the phone that Mr. Williams was still over her affairs. Mr. Barry acknowledged at trial that Mr. Williams was not involved with the gift, but he said he confirmed to Jean that Mr. Williams was over her affairs because he was "involved in her affairs in the sense that he stayed in contact with her and knew the general extent of her assets."[12]

Sally Brewer also testified at trial. She had been employed at Chambliss Bahner since 2012. Her official title was "Care Coordinator . . . Slash paralegal." However, when she began work at the law firm, the reason she was classified as a paralegal was because the firm did not have a classification for a Care Coordinator. She had no formal legal training at the time and had not attended "paralegal school." She had a college degree in "therapeutic recreation and special populations," and her work history was in the geriatric field. After college, Ms. Brewer had worked as a therapeutic recreation specialist at a rehabilitation center, at a nursing home as a certified activity director, at an assisted living facility as a program director, and at an adult daycare. She then became a program director for the Chattanooga South Chapter of the Alzheimer's Association. She left that job to become a personal care assistant for an elderly individual with dementia then worked at a small financial planning firm before starting at Chambliss Bahner. At some point during this employment history, around 2009, she had obtained a certification as a "Qualified Dementia Care Specialist" through the Alzheimer's Foundation of America. After she left the nursing home and adult daycare setting and began working on "the financial and legal side of aging," she obtained a different certification as a "Certified Dementia Practitioner" because it was "a better fit" in light of her having less "hands on" time with patients. At the time of trial, Ms. Brewer was still certified as a "Dementia Practitioner" with the "National Council of Certified Dementia Practitioners." Ms. Brewer testified that she was brought on board at Chambliss Bahner to help attorneys with the "social aspect and the cognition aspect of their elderly clients." She explained that the "cognitive screening" she

---

[12] Grady Williams was asked at trial if he was "over the affairs of Jean Ellis," and he responded, "Over the affairs. No, absolutely not." He said he was co-trustee of the family trust but "not over Jean's affairs at all" and "had nothing to do with Jean's affairs."

performs is "[t]esting to see if someone has knowledge and insight and intent in a thought process and just can comprehend."

Ms. Brewer identified the email she received from Christina requesting some kind of legal documentation of the gift. Ms. Brewer said she and Christina had worked on other cases together in the past with another attorney at Chambliss Bahner. However, she said her first involvement with Jean was when Ryan Barry asked her to do a home visit to make sure Jean was not "being coerced" and that "she had the capacity to do what she was being asked to do[.]" She had reviewed Jean's file before she went. Ms. Brewer recalled seeing a doctor's statement that he believed Jean had decision-making capacity but did not recall if she knew Jean was prescribed hydrocodone. Ms. Brewer did not remember looking at any specifics regarding Jean's estate or what she owned. She said Mr. Barry's biggest concern was whether Jean had dementia and was capable of signing the documents, so her "job number one" was to see if she was competent and had capacity to sign.

Ms. Brewer testified that when she arrived at Jean's house on August 5, Christina answered the door, and she also saw Jean, Mike, and one or two caregivers. Ms. Brewer did not know if Christina's mother Judy was present because she did not know her and would not have recognized her. Ms. Brewer said they stayed inside the home for a little bit, exchanging pleasantries, then she suggested that they go to a private area to talk. She said Jean suggested the back porch, which had a sliding glass door. Ms. Brewer said that Christina did not follow them to the back porch but that a caregiver may have initially. She testified that no one was in the room at the time of their discussion besides her and Jean. Ms. Brewer recalled seeing medication bottles around Jean. She said Jean was on hospice care and that oxygen was also near her recliner. She recalled that Jean had cancer, asthma, anxiety, and depression. She described Jean's demeanor as "short of breath . . . but she was very pleasant." She said Jean had "good communication" and did not act groggy, loopy, or sleepy or otherwise show effects of narcotic medication. However, because Jean had obvious "shortness of breath making lengthy conversation difficult," Ms. Brewer had attempted to make the visit as "short and to the point as possible."

Ms. Brewer testified that there are a number of tests that one should "pull" from during a cognitive screening, depending on the circumstances. She said she used "a couple of different tests" when speaking with Jean, including a Mini Mental Status Exam and the St. Louis University Mental Exam. The written memorandum she had prepared stated that she completed "a quick cognitive screening" and that Jean "did not fail orientation and memory questioning." It further stated, "It is my professional opinion as a Qualified Dementia Care Specialist that [Jean] had the capacity on August 5, 2015 to make decisions regarding her estate planning desires." When asked at trial if there was a score from Jean's cognitive testing, Ms. Brewer responded, "I didn't do a full – I didn't go through – there's 30, a possible 30 points. I didn't go through the whole thing." She said she "did a little bit of the tool, a little bit of observation," and "some long-term memory questioning." She said the cognitive screening was "ongoing" throughout the entire meeting. Ms. Brewer

- 27 -

recalled that Jean discussed her recent health issues and pointed out things about her home and surrounding property. She said Jean also discussed her property in general, indicating she knew she had a certain amount of wealth, although Jean did not mention any specifics or "dollar figures." Ms. Brewer knew Jean was wealthy but did not know how much money she had. She recalled Jean also talking about her family and the fact that she appreciated them taking care of her.

Ms. Brewer said after about 20 minutes of conversation, they started to discuss her estate plan. She said Jean wanted to make sure things were set up the way she wanted, and questions arose about her executor and "who was in charge of her things" and "over her affairs." She said it was very important to Jean to get confirmation that "Grady Williams was still over her affairs." Ms. Brewer said she could not answer Jean's question so she called Ryan Barry on speakerphone to ask him, and he had a conversation with them via speakerphone about the estate plan. She said this conversation "made [Jean] feel comfortable" and that she went on and on about how much trust she had in Mr. Williams and "how pleased she was to have him assisting her." Ms. Brewer said by the end of the phone conversation, it was decided jointly, by her and Mr. Barry, that Jean had capacity to sign the documents. Ms. Brewer testified that she read both documents to Jean before she signed them. She said Jean talked about the documents and appeared to understand and want to sign them. Like Mr. Barry, however, Ms. Brewer had no contemporaneous knowledge that checks had already been written for $1,000 for earnest money and $175,000 to complete the gift. She did not know that Jean's checking account had insufficient funds to cover the gift or that Christina had requested a surrender of Jean's annuity to cover the difference. She was likewise unaware that Christina had represented to Jean that she would take care of Mike at the house after Jean died.

When asked if any of the various tests she uses relate to competence, Ms. Brewer said, "I think they all do." However, when asked if the tests relate to coercion, she said, "Not necessarily." Still, Ms. Brewer said she does other "tests" regarding undue influence or coercion. "First of all," she said, "I ask the person." Then, she said "there is a series of observations that you can make with somebody that is being coerced or unduly influenced. It's definitely fear, isolation, over dependence, overwhelmed, being overwhelmed. I saw none of that." Ms. Brewer said she would also consider if someone was in the room with the person "winking at them or twisting their arm." She said she did not see anyone watching her and Jean during their discussion or coaching Jean or communicating with her in any way. When Ms. Brewer was asked if Christina ever tried to influence Ms. Brewer with respect to the meeting, Ms. Brewer said, "I don't recall. And if she would have, I typically put clients in their place that try to do that and tell them that that's above my pay grade or take it to the attorney[.]" When asked if she and Christina had a personal relationship around this time, Ms. Brewer again said, "I don't recall. . . . I only recall business social." She described seeing Christina at monthly meetings, social worker meetings, and senior networking meetings. She said she had referred Christina to some people because Christina was a good case manager and she had done a phenomenal job on

a case they had worked on together. They had been referring business to each other since around 2013. Ms. Brewer was aware that her endorsement was used on the Care Connections website, along with that of an attorney at Chambliss Bahner.

Ms. Brewer identified the memo and timeline dated March 2016 that she had provided to the attorneys at Chambliss Bahner regarding her August 2015 visit with Jean. She had no explanation for why it was apparently prepared seven months after the fact and said that her standard practice was to prepare a memo within 24 hours after a cognitive screening. Ms. Brewer acknowledged the statement in her original memo that Jean "did exhibit anxiety which may have contributed to her indecisiveness." She said she wrote that to let Mr. Barry know that Jean did not have anxiety because of dementia but due to "her general anxieties." Ms. Brewer was asked if she thought anxiety might indicate undue influence, to which she responded that high anxiety or being overwhelmed might "make [her] guard go up on coercion," but she said Jean did not display anxiety "the whole time" and was not overwhelmed. She said Jean showed anxiety after walking when she was short of breath. She said generally Jean was calm and appropriate and that nothing was suspicious. Ms. Brewer did not believe that indecisiveness would indicate undue influence. She admitted, however, that she had received no formal training on undue influence. She admitted during her deposition that she did not know the specific legal factors that courts consider in determining whether there is undue influence. She also admitted at trial that, as a nonlawyer, she did not attempt to give Jean any legal advice about the legal effect, consequences, or advisability of giving $175,000 to the person holding power of attorney for her.

Finally, Greg Willett from Chambliss Bahner testified about his involvement with the estate administration after Jean died. He had communicated with Sally Brewer and Ryan Barry and suggested that they create documents summarizing their interactions with Jean in anticipation of litigation. Based on these and other documents available to Chambliss Bahner, and discussions with Steve Jett, he decided not to pursue a claim for undue influence. He believed it was beneficial to assign the claim to the residuary beneficiaries so that each one could individually evaluate whether to pursue the claim and retain his own attorney at his own expense. Mr. Willett also said he "understood that there was a potential conflict of interest" with Chambliss Bahner when he was deciding whether to assign the claim to the beneficiaries.[13] Mr. Willett said the decision was made to remove

---

[13] The following exchange took place during Mr. Willett's testimony:

Q.      Chambliss Bahner is sitting there trying to decide whether there is somebody – whether there is a claim for undue influence is – is right in the middle of that case. They are participants in the transaction, they were witnesses in the case, and they are completely conflicted out of representing anybody in the litigation, right?
A.      Hence the assignment to your clients.
Q.      What I'm asking is: You understood that there was a conflict of interest?
A.      I understood that there was a potential conflict of interest.

the sentence from Sally Brewer's memo regarding anxiety and indecisiveness because he did not feel that it was necessary after discussing the issue with her directly. According to Mr. Willett, Ms. Brewer explained that her sentence was not intended to suggest incapacity or undue influence, so the sentence was removed "to avoid any confusion." He said this was not meant to mislead the beneficiaries.

At the conclusion of the five-day trial, the trial judge took the matter under advisement. On April 27, 2020, the trial court entered a 28-page written order with extensive findings of fact and conclusions of law. Notably, after summarizing the testimony of each witness, the trial court made several credibility findings that greatly assist this Court on appeal. The trial court found that Ms. Smith and Ms. Melton, Jean's two caregivers, were both credible witnesses. The court also found that Jean's grandsons -- Nick, Hunter, and Michael -- were credible. As for trustee Grady Williams, the trial court found him "objective and persuasive" and said "his concern about the propriety of Chris's conduct was clear and credible." The trial court found the testimony of Ryan Barry to be "credible" but gave it "less weight in light of the troubling fact that Mr. Barry's most direct interaction with Jean concerning the transfer of $175,000 was over the phone." As for Sally Brewer, the court "commend[ed]" her and Chambliss Bahner for attempting to establish donative capacity, but, the court added, "Chris's actions in acting first by writing the Check prior to the Meeting and then later attempting to utilize [Chambliss Bahner] and its staff to 'bless' the transfer after-the-fact significantly reduces the persuasiveness of the [Chambliss Bahner] witness's testimony." The trial court found the testimony of Greg Willett, counsel for the bank/executor, "contributed little to the issues to be decided" because "his primary participation was long after the events giving rise to this action." The court found that "Judy was credible only to the extent that she had some affection for Jean, but her testimony was otherwise not persuasive." The trial court did not include an overall credibility determination regarding Christina, but it found that her testimony that she did not know how the Prudential annuity check was deposited in Jean's account was "precarious at best."

The trial court noted the parties' stipulation that a confidential relationship existed between Christina and Jean. For reasons that will be discussed in greater detail below, the trial court also found the existence of "multiple suspicious factors" in this case. Thus, the trial court concluded that a presumption of undue influence had arisen. The court noted that Christina and Judy had attempted to overcome the presumption of undue influence and show that the transfer was fair by relying on the involvement of Chambliss Bahner to show independent advice. However, the court concluded that this evidence did not overcome the presumption of undue influence. The trial court found that Christina violated the terms of

Counsel later asked "when you-all found out that these folks wanted to pursue that claim . . . in that meeting," "you could not handle that because you were conflicted out, right?" Mr. Willett responded, "That's right."

the power of attorney by cashing out the annuity to enable her to purchase a house for her own benefit and violated her fiduciary duties by engaging in actions showing "self-dealing and a complete lack of loyalty and good faith to the principal, Jean." It found that the correct amount of damages to be awarded was $176,000, which represented the earnest money and subsequent gift check to Christina. Judgment was entered against Christina in that amount. However, the trial court noted that Judy did not receive either of the two checks, so it dismissed the claims asserted against Judy. Finally, with respect to the plaintiffs' request for attorney fees, the trial court found that "[a]ttorney fees are not available under the current caselaw relating to undue influence and are not sought pursuant to any relevant statute." Thus, the request was denied. Christina timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Christina raises the following issues for review on appeal:

1. Whether the trial court erroneously based its decision in part on Christina's failure to prove Jean's competency at the time of the gift when competency was stipulated not to be at issue;
2. Whether the trial court erred in finding there were suspicious circumstances; and
3. Whether the trial court erred in finding undue influence when Jean received competent independent advice from her attorney and underwent a cognitive screening from a qualified dementia care specialist before depositing the check.

In their posture as appellees, the plaintiffs raise the following additional issues:

1. Whether the trial court erred in concluding that attorney fees were not available under current caselaw relating to undue influence;
2. Whether the plaintiffs should be awarded their attorney fees and expenses incurred in defending against Christina's appeal.

For the following reasons, we affirm the finding of undue influence, reverse the denial of attorney fees, and remand for the trial court to determine a reasonable award for the fees incurred at trial and on appeal.

## III. DISCUSSION

"The dominant rule in Tennessee and elsewhere is that the existence of a confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party," gives rise to a presumption of undue influence that "may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995) (citing *Roberts v. Chase*, 166 S.W.2d 641 (Tenn. Ct. App. 1942); *Richmond v. Christian*, 555 S.W.2d 105 (Tenn. 1977); *Hogan v.*

- 31 -

*Cooper*, 619 S.W.2d 516 (Tenn. 1981); *Brown v. Weik*, 725 S.W.2d 938 (Tenn. App. 1983); *Estate of Depriest v. Allen*, 733 S.W.2d 74 (Tenn. App. 1986); 19 A.L.R.3d 575, 596). Here, Christina concedes that a confidential relationship existed. *See In re Estate of Link*, 542 S.W.3d 438, 453 (Tenn. Ct. App. 2017) ("[A] confidential relationship arises as a matter of law when an unrestricted power of attorney is granted in favor of the dominant party and is, in fact, exercised by the dominant party.") "The execution and exercise of a power of attorney establishes a fiduciary relationship between the attorney-in-fact and the grantor of the power," such that the fiduciary is obligated to deal with the property of the principal in the utmost good faith. *Bottorff v. Sears*, No. M2017-01363-COA-R3-CV, 2018 WL 3574745, at *6 (Tenn. Ct. App. July 25, 2018) (citation omitted). "[T]he presumption of undue influence extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party." *Parish v. Kemp*, 179 S.W.3d 524, 531 (Tenn. Ct. App. 2005) (quoting *Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979)). Christina was the dominant party in the confidential relationship and clearly benefitted from the gift. Thus, a presumption of undue influence arose, and Christina must establish that the transaction was fair by clear and convincing evidence. *Id.*

"Determining whether undue influence has occurred is a question of fact." *Jarnigan v. Moyers*, 568 S.W.3d 585, 591 (Tenn. Ct. App. 2018) (citing *Cartwright v. Jackson Capital Partners, Ltd. P'ship*, 478 S.W.3d 596, 607 (Tenn. Ct. App. 2015)). As such, an appellate court must "affirm the trial court's finding of undue influence unless the evidence preponderates otherwise." *Id.* Because direct evidence of undue influence is rarely available, undue influence can be established by showing "suspicious circumstances" leading to a conclusion that the allegedly influenced person did not act freely and independently. *Id.* At the same time, however, a presumption of undue influence can be rebutted by showing a lack of suspicious circumstances. *In re Est. of Lipscomb*, No. W2018-01935-COA-R3-CV, 2020 WL 1549596, at *10 (Tenn. Ct. App. Apr. 1, 2020) (citing *Parish v. Kemp*, 308 S.W.3d 884, 891 (Tenn. Ct. App. 2008)). The following "suspicious circumstances" are relevant to the analysis:

> (1) the decedent's advanced age and/or physical or mental deterioration; (2) the dominant party's active involvement in the transactions at issue; (3) secrecy concerning the transaction's existence; (4) the lack of independent advice; (4) the decedent's illiteracy or blindness; (5) the unjust or unnatural nature of the transaction; (6) the decedent being in an emotionally distraught state; (7) discrepancies between the transaction and the decedent's expressed intentions; and (8) fraud or duress directed toward the decedent.

*Id.* at *11 (citing *In re Est. of Brindley*, No. M1999-02224-COA-R3-CV, 2002 WL 1827578, at *14 (Tenn. Ct. App. Aug. 7, 2002)). The scope of evidence regarding fairness is quite broad, and there is no mathematical formula for determining the number or type of

suspicious circumstances that will support a finding of undue influence. *Id.* at *10-11. Ultimately, the difficulty of establishing the fairness of a transaction can vary depending on the circumstances of the case and the strength of the presumption of undue influence. *Id.* at *10 (citing *In re Est. of Murdaugh*, No. W2011-00041-COA-R3-CV, 2011 WL 6141067, at *3 (Tenn. Ct. App. Dec. 8, 2011)). Proof of independent advice may be required if the fairness of the transaction would be difficult to prove otherwise, but this requirement typically arises when the transaction in question is a gift from a feeble or incompetent subservient party and leaves the donor impoverished. *Id.*

In the case at bar, the trial court found the existence of "multiple" suspicious circumstances. On appeal, Christina argues that the trial court erred in finding any suspicious circumstances because "there was a total lack of proof of anything suspicious about the circumstance[s.]" On this issue, we agree with the trial court. First, we note that Jean was of advanced age and experiencing both physical and mental "deterioration." *See In re Est. of Lipscomb*, 2020 WL 1549596, at *10. The trial court found that "Jean's mental and physical health [had] declined." She was 83 years old at the time of the gift and in the midst of a long battle with pancreatic cancer, which led to her death six months later. She suffered from depression. The trial court found that Jean "required constant medication and caregiving assistance for daily activities." It noted that Jean was medicated with hydrocodone and Xanax. It noted Christina's testimony that Jean experienced confusion. We cannot agree with Christina's argument on appeal that Jean's pain medication "bear[s] no relationship to the transaction" or that there was no proof that Jean "was on pain killers at any time involving the gift, especially the meeting with Ms. Brewer." The trial court specifically credited the testimony of Jean's caregivers that she was "always on medication to some extent" over Christina's testimony to the contrary. "We will not second-guess the trial court's credibility determinations without clear and convincing evidence to the contrary," which this record does not contain. *Abdur'Rahman v. Parker*, 558 S.W.3d 606, 624 (Tenn. 2018). The trial court also noted that even Christina had "expressed concern" to Chambliss Bahner about Jean's competency and memory and taken her to a doctor to have her mental state evaluated. The trial court described Jean as being in a "fragile mental and physical state" and "under hospice care." We agree with the trial court that these were suspicious circumstances. As Christina put it during trial, Jean "would have been vulnerable to anybody."

Christina argues that the trial court ignored testimony from a caregiver about Jean declining to sign estate documents until they were revised three or four times, which, according to Christina, shows that Jean was "strong willed." Whether a decedent remained strong-willed is an appropriate consideration. Courts have "considered evidence that the decedent was still capable of making her own decisions, and the decedent had a headstrong personality." *Simpson v. Simpson*, No. E2018-01686-COA-R3-CV, 2019 WL 2157937, at *6 (Tenn. Ct. App. May 17, 2019) (internal quotations omitted). In *Simpson*, for instance, the Court considered that the decedent was "a strong-willed man who was not easily led by others." *Id.* at *8; *see also In re Est. of Maddox*, 60 S.W.3d 84, 90 (Tenn. Ct. App.

2001) (describing the decedent as a strong willed woman who was "not controlled by anyone"). However, Grady Williams testified that Jean was a person who "changed her mind a lot." He said, "Today she wanted to do this. Tomorrow she wanted to do something else. Change her will, or change this, change that. She was a very changeable person; a person that kind of listened to everybody and probably whoever the last person she talked to was the thing that she was interested in and okay with, but she was a very changeable person." Thus, the testimony credited by the trial court shows that Jean was easily led by others and more susceptible to undue influence.

Another factor to consider is whether the decedent was in an emotionally distraught state. The trial court found this factor was also useful for evaluating the facts in this case. It noted the caregiver's testimony that Jean would become "upset when discussing her estate, sometimes to the point of suffering panic attacks." It also mentioned Nick's testimony that Christina once told him to give Jean a hydrocodone before a meeting about her will. Ms. Brewer's memo also noted Jean's anxiety and indecisiveness on the day she executed the document.

Another circumstance to consider is whether Christina was actively involved in the transaction at issue. We conclude that she was. As counsel for Nick and Hunter aptly stated during closing argument, "Ms. Duggan's fingerprints are all over this thing." She admittedly had several discussions with Jean about buying the house and made statements that could be perceived as influencing Jean to buy it. The following exchange occurred during her testimony:

> Q. You told Jean – you told Jean that if she gave you the money to buy that property at 5532 Shady Branch Drive, you would take care of Mike Sr. there[,] after he – after she died?
> A. I told her I would be glad to take care of him if Rick would allow him to live with me. We knew that that was not definitive.

As Ms. Smith, one of the caregivers, described it, "I felt that she was trying to coach Jean into buying it for her by using Mr. Mike." Christina was also actively involved in the details of the transfer. The earnest money check was completely in Christina's handwriting, the check to herself for $175,000 was all in her handwriting except for Jean's signature, and the annuity surrender paperwork was submitted solely by Christina as "POA."[14] The trial court noted that Christina was the one who contacted Chambliss Bahner

---

[14] Christina's brief on appeal suggests that the trial court incorrectly framed the issues by stating that there were three transactions giving rise to this dispute – the earnest money check, the gift check, and the liquidation of the annuity. Christina argues that the single issue should have been the validity of a single gift made on August 5, when Jean executed the document with Ms. Brewer. However, she cites no authority with respect to this argument and does not explain her position that this was a "fundamental mistake[] of law." We discern no error in the trial court's reference to these three transactions in connection with the gift.

to see if there was a document that could be executed to memorialize Jean's gift to her. The trial court was "troubled" by the way Chambliss Bahner's involvement was initiated and pointed out that most of Mr. Barry's communication was with Christina rather than Jean. Christina was also present at Jean's home when Ms. Brewer brought the documents for Jean to sign. The court referenced the testimony of Grady Williams that Christina called him and asked whether the trust could fund the transfer. Notably, the trial court stated that it "finds credible, and is persuaded by," the caregiver testimony that Christina and Judy "worked on" Jean in her fragile mental and physical state in order to benefit themselves. It also found that Christina's role as Jean's power of attorney "provided her plenty of opportunities to influence the distribution of Jean's assets." It found that Christina had inquired about having the trust purchase a house that would revert to her as early as 2013, which "casts into doubt any notion that the funds for the House were Jean's idea." We agree with the trial court that Christina was an integral part of this transaction, and her extensive involvement in orchestrating the transfer was suspicious.

The next consideration is secrecy concerning the transaction's existence. On appeal, Christina argues that "there was no secrecy about the Gift which Jean wanted to make." According to Christina, "[t]here may have been some lack of disclosure about some of the events necessary to implement the Gift, but there was no secrecy about the Gift itself." She argues that Chambliss Bahner knew about the gift, along with her mother Judy, Judy's husband, and Christina's friend. The trial court's final order states that the court was "startled by the amount of secrecy Chris and Judy employed in this case" and "concerned by the level of secrecy in which Chris cloaked her actions." It noted Christina's admission that she did not discuss the gift or the liquidation of the annuity with Jean's grandsons because she considered it Jean's private business. At the same, the trial court noted, Christina admitted she anticipated that they would take issue with the transfers and that she was seeking "protection and validation" as a result. The trial court found that Christina "carefully and deliberately concealed her actions from Plaintiffs for fear she would not be able to consummate the transfer if her plan was known." The record supports these findings. Christina argues on appeal that she had no "duty" to inform Jean's heirs about the gift. That may be so, but secrecy is still a suspicious circumstance to be considered in the undue influence analysis.

Suspicious circumstances can also include "the unjust or unnatural nature of the transaction" and "discrepancies between the transaction and the decedent's expressed intentions." *In re Est. of Lipscomb*, 2020 WL 1549596, at *11. We deem several facts relevant to these factors. First, with specific regard to the annuity, the trial court noted that Jean had named three of her grandsons as the beneficiaries, and it found "no credible testimony that Chris ever obtained permission to cash out the Annuity to fund the $175,000 transfer." Also, the trial court found that "the notion of Mike Sr., ever living with Chris was speculative at best." The trial court acknowledged Christina's suggestion that a gift of $175,000 was not an unjustly large portion of Jean's estate of around $1.8 million. On appeal, Christina similarly argues that the gift did not leave Jean insolvent. Still, Jean's

will had only left $70,000 to Christina and the majority of her estate to her sons and grandsons. In addition, Grady Williams testified that "with an estate no larger than Jean's was," a gift to Christina of $175,000 in 2015 was "a very, very substantial gift," especially in light of the plan that was put in place to liquidate some of Jean's assets and conserve her resources for her expensive caregivers. In fact, Jean did not have sufficient liquid funds to cover the gift. Christina argues on appeal that the gift was not unnatural because Jean had given her grandson Michael thirteen acres in 2013, the day before she went into surgery. However, Christina's mother testified that she had not considered that transaction a gift. Another individual was permitted to continue living on the property for his lifetime. Mr. Jett's records referred to the transfer as a gift and reflected that Jean had struggled to decide whether it would "count against his share under her will," and ultimately, she concluded that it would not. However, we note that Jean's grandson Nick *was* required to use his inheritance money to purchase the house where he lived. By all accounts, Jean was very frugal. Thus, several aspects of the gift to Christina could be considered unjust, unnatural, and in conflict with Jean's otherwise expressed intentions.

As additional "evidence of Chris's bad acts" supporting a finding of undue influence, the trial court found that Christina breached the terms of the power of attorney by using it to make a gratuitous transfer to herself. The document stated, "I specifically prohibit my attorney-in-fact from making any non-charitable gifts, grants or other gratuitous transfers pursuant to this power of attorney." The trial court found that Christina "violated the terms of her POA in cashing out the Annuity to fund the Check prewritten from Jean's account to enable [her] to purchase the House for her own benefit." The trial court found that "gifting [was] banned altogether," that Christina "was not permitted to gift herself Jean's assets under any circumstances," and that she "knowingly violated the POA to benefit herself." It found that, pursuant to the power of attorney, Christina "had no authority to authorize any gift or gratuitous transfer to herself, even at Jean's direction." Christina argues on appeal that the trial court erred in its conclusion regarding the power of attorney. After making the above findings, the trial court stated that Ryan Barry had testified that Christina could not self-gift "even at Jean's direction," and that the principal would have to effectuate a gift herself. This is not entirely correct. Initially, Mr. Barry did testify that Jean initialed the option that would not allow noncharitable gifts "to be carried out by the agent." In other words, he said the attorney-in-fact would not have "gifting authority." He said this would prohibit "any gifts, period, to herself or otherwise." Upon further questioning, however, Mr. Barry said there were a number of sections dealing with conducting business and transactions generally, which "could be interpreted to say if the principal has asked me to make this transaction, then I can carry out that transaction whether it's to myself or someone else." Thus, Mr. Barry said that if the directed transaction involved shifting funds to individuals, he "suppose[d]" he would interpret it to mean that the agent could consummate a gift to herself if it was at the direction of the principal.

In summary, the trial court's characterization of Mr. Barry's testimony was not

entirely accurate. However, regardless of Mr. Barry's opinion on that issue, we agree with the trial court's conclusion that Christina violated the power of attorney through her conduct in this case. The power of attorney clearly prohibited Christina "from making any non-charitable gifts, grants or other gratuitous transfers *pursuant to this power of attorney*." (emphasis added). Yet, as the trial court found, Christina *utilized the power of attorney* to cash out the annuity, signing the documents with her own name and the designation of "POA," in order to fund the check enabling her to purchase the house for her own benefit. The trial court found "no *credible* testimony that Chris ever obtained permission to cash out the Annuity to fund the $175,000 transfer." (emphasis added). Thus, we reject Christina's argument with respect to this issue. *See In re Conservatorship of Patton*, No. M2012-01078-COA-R3-CV, 2014 WL 4803146, at *4-5 (Tenn. Ct. App. Sept. 26, 2014) (acknowledging an agent's argument that gifts were accomplished through "consent" because the principal "authorized her to make the transfers in question; thus, she did not act under the power of attorney," but finding the proof showed that the transactions were accomplished "through the use of her power of attorney" and made by her "as power of attorney"); *Hendrix v. Life Care Centers of Am., Inc.*, No. E2006-02288-COA-R3-CV, 2007 WL 4523876, at *5 (Tenn. Ct. App. Dec. 21, 2007) (declining to find express authority by permission where the evidence was "inextricably intertwined with the power-of-attorney issue" and did not establish "a separate agency relationship that can be analyzed independently of that document").

As further evidence of Christina's "bad acts," the trial court found that her actions demonstrated "self-dealing and a complete lack of loyalty and good faith to the principal," violating her fiduciary duties. We agree with this assessment as well.[15] Christina argues that the transfer benefitted Jean by giving her "peace of mind" because there was a possibility that Mike would live there. However, as the trial court found, "the notion of Mike Sr., ever living with Chris was speculative at best." She purchased the house "to benefit herself."

The final factor that is relevant to our analysis is whether there was independent advice. Throughout this case, Christina has argued that the advice given by Chambliss Bahner bars any claim for undue influence. Before the trial court, her attorney argued during opening statements that "10 minutes of testimony" from Ryan Barry "could end this case." He argued,

> [E]ven if Ms. Duggan unduly influenced Ms. Ellis as they allege – even if it
> shows that she did all these horrible things that they're going to say she did,

---

[15] Christina does note one factual finding by the trial court that, in our view, was not supported by the evidence. The order states, "Mr. Barry noted that Chris, in her capacity as attorney-in-fact over Jean *as a co-trustee of the Trust, could only transfer assets from the Trust for the health, maintenance, and support of Jean and her descendants.*" (emphasis added). Christina correctly notes that she did not serve as a co-trustee of the trust. She says this is an "example" of the trial court "misstating the record." However, this minor misstatement within the 28-page order was harmless error.

the fact that Ms. Ellis met with Ryan Barry and Sally Brewer alone and received competent, independent advice breaks that chain, shows that she understood the nature of her transaction, understood the consequences. Game over. This case is won by the defense.

Likewise, he suggested during closing arguments that independent advice "can cover up any tarnish." On appeal, Christina maintains that "this case can be decided on one issue alone – did the decedent receive competent independent advice from the Chambliss firm – and if the answer is yes, then all other analyses do not matter[.]" However, Christina's position is not an accurate characterization of the law regarding independent advice.

We begin with our supreme court's discussion of independent advice in *Richmond v. Christian*, 555 S.W.2d 105 (Tenn. 1977). In that case, an 83-year-old decedent executed a deed to her son twenty days before her death, conveying to him the only land she owned. *Id.* at 106. The decedent's two daughters filed suit to set aside the deed on the basis of undue influence, arguing that the decedent "acted without the benefit of independent advice." *Id.* The decedent had instructed her son to contact an attorney to have the deed drafted, so the son employed an attorney to prepare the deed and assist the decedent in its execution. *Id.* at 107. The attorney delivered the deed to the decedent and "had a brief conversation with [her] and read the deed to her, reminded her that the deed transferred all of her real estate to her son and asked her if that was what she desired to do." *Id.* She responded affirmatively. *Id.* The son and two of his friends were present during this conversation. *Id.* The two friends testified that they also witnessed the decedent's will, which the attorney read and explained that it bequeathed her personal property to her son. *Id.* The decedent reportedly replied "that's all that's left." *Id.* However, the attorney testified that "he was not requested to and did not attempt to privately counsel with [the decedent] respecting the advisability of the disposition of all her property to her son to the exclusion of her two daughters." *Id.*

The Tennessee Supreme Court was tasked with deciding "whether or not proof of independent advice is shown in this case." *Id.* at 109. The Court explained that "adequate proof of independent advice" had been defined as follows:

'Proper independent advice in this connection means that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefactions.'

*Id.* at 109 (quoting *Turner v. Leathers*, 232 S.W.2d 269, 271 (Tenn. 1950)). "Measured by

- 38 -

this test," the court concluded that the conversation between the decedent and the attorney "did not amount to proof of independent advice." *Id.* First, the court noted that the conversation was not private, as the donee was seated across the room along with two friends. *Id.* In addition, the attorney was employed by the donee, not the decedent. *Id.* Finally, "the decedent apparently did not seek and, certainly, did not receive advice from an independent source concerning the advisability of the transfer to her son." *Id.* The court found that the attorney's discussion of the transaction with the decedent "was cursory at best," as he "merely determined that she knew that the deed transferred the entire tract to her son and that such a transfer was what she intended." *Id.* This "falls short" of the requirement that independent advice be "complete as well as private." *Id.* The court noted that in *Turner v. Leathers* the donor had similarly "met with an alleged independent advisor and told him that he knew what he was doing and intended to do it." *Id.* Still, the court in *Turner* had explained, "'It is not a question of whether he knew what he intended to do, but how this intention was produced, whether it was by abuse of a confidential and fiduciary relation.'" *Id.* (quoting *Turner*, 232 S.W.2d at 271). Considering all the facts in the *Richmond* case, the court held that independent advice was not shown by the proof in the record. *Id.* at 110.

Tennessee courts have repeatedly applied the principles set forth in *Richmond* and *Turner* to determine whether there was *adequate* proof of independent advice. *See, e.g.*, *Simpson*, 2019 WL 2157937, at *7 (finding no independent advice where "the deed itself was explained to Decedent" but it did not appear that she "received any independent advice in reaching the decision to transfer the property"); *Malek v. Gunter*, No. M2009-00059-COA-R3-CV, 2009 WL 4878613, at *8 (Tenn. Ct. App. Dec. 16, 2009) (finding that the family attorney's involvement did not meet the definition of independent advice where the defendant was present when the deed was prepared and delivered, the decision to transfer the property was the result of conversations that included the defendant, and the decedent did not confer privately with the attorney at any time concerning the transfer); *In re Est. of Schisler*, 316 S.W.3d 599, 611 (Tenn. Ct. App. 2009) ("[T]he advice [the decedent] received from the Lawrenceburg attorney was not independent given the active roles Carroll and Linda played.").

Even where independent advice *is* shown, "'the existence of independent advice may not be sufficient to rebut a presumption of undue influence especially in a case, such as this, where the particular circumstances strengthen the presumption of undue influence.'" *In re Est. of Farmer*, No. M2016-01300-COA-R3-CV, 2017 WL 1830096, at *17 (Tenn. Ct. App. May 5, 2017) (quoting *In re Est. of Murdaugh*, 2011 WL 6141067, at *5). For instance, in *Francis v. Barnes*, No. W2012-02316-COA-R3-CV, 2013 WL 5372851, at *9 (Tenn. Ct. App. Sept. 23, 2013), an attorney testified that "he fully advised [the decedent] regarding the legal consequences of [the] deed" at issue. Still, the trial court "was unpersuaded," finding that the attorney "was unable to recognize the severity of [the decedent's] mental condition and that any advice she received under the circumstances was inappropriate." *Id.* This Court agreed that the proof fell short of establishing clear and

convincing evidence that the transaction was fair. *Id. See also In re Est. of Murdaugh*, 2011 WL 6141067, at *5 (considering the totality of the circumstances and concluding that "independent advice, without more, [was] insufficient to clearly and convincingly rebut the presumption of undue influence"); *Gabriel v. Hubbs*, No. E2001-03102-COA-R3-CV, 2002 WL 31863301, at *7 (Tenn. Ct. App. Dec. 23, 2002) (concluding that independent advice the decedent received was insufficient to overcome the presumption of undue influence); *In re Est. of Neely*, No. M2000-01144-COA-R3-CV, 2001 WL 1262598, at *5 (Tenn. Ct. App. Oct. 22, 2001) (acknowledging that the defendant was not in the room during the decedent's two conversations with a lawyer and was not directly involved with the lawyer but concluding that her "hands-off attitude" regarding execution of the will did not eliminate the questions raised by her conduct or fully dispel the presumption of undue influence).

We find the facts of this case quite similar to those present in *In re Estate of Park*, No. M2003-00604-COA-R3-CV, 2005 WL 3059443 (Tenn. Ct. App. Nov. 14, 2005). In that case, the defendant argued that even if the record contained proof of suspicious circumstances surrounding the execution of the decedent's will, she rebutted the presumption by showing that an attorney assisted the decedent with the preparation of her will, evidencing independent advice. *Id.* at *10. This Court found "little merit in this argument for two reasons." *Id.* First, we noted that the defendant was "directly and actively involved in the preparation" of the will. *Id.* She was the one who selected and initially contacted the attorney and "facilitated his meetings" with the decedent. *Id.* The attorney had visited the decedent's home three times over the course of a few days, and even though the defendant was not physically present in the room when the attorney talked with the decedent, she was at the home and may have been eavesdropping through a baby monitor. *Id.* at *3, 10. Secondly, we explained that "the independence and efficacy of [the attorney's] advice [was] undermined by his lack of familiarity with [the decedent's] holdings and her physical condition." *Id.* at *11. The attorney admitted he was "unaware of the extent of [the decedent's] wealth." *Id.* He was also unaware of her recent hospitalizations and psychological consults, her medications, and the role the defendant played in the her life. *Id.* We explained that once the burden of persuasion shifted to the defendant, she was required to present "clear and convincing evidence to dispel the taint of undue influence," but her evidence was "far from convincing." *Id.*

Ultimately, "the question of whether a donor has had the benefit of the requisite independent advice necessarily turns on the facts of each case, and, obviously, the testimony of the witnesses." *Gabriel*, 2002 WL 31863301, at *6. The trial court's determination of witness credibility is given great deference. *Id.* Here, the trial court noted it was Christina who reached out to Chambliss Bahner for some kind of legal document to memorialize the gift because she wanted "protection." It discussed Mr. Barry's testimony that "he confirmed by phone that Jean wanted to give Chris the money," informed her of the tax consequences, and warned her that the transaction could not be undone. It also noted, however, that Mr. Barry did not know if anyone was with Jean during the phone

conversation.  The court noted Mr. Barry did not know that the check for $175,000 had already been written or that the annuity had been cashed out before the meeting with Ms. Brewer.  Although the court found that Mr. Barry testified credibly, it gave his testimony "less weight in light of the troubling fact that Mr. Barry's most direct interaction with Jean concerning the transfer of $175,000 was over the phone."

Regarding Sally Brewer, the trial court pointed out that Christina had reached out to her and that the two women had a "business-social relationship" and had "referred business back and forth" for a couple of years.  It noted Ms. Brewer's testimony that she did not have a general understanding of Jean's estate.  Although Ms. Brewer had opined that Jean had the "capacity and intent" to execute the documents, the trial court found that Ms. Brewer failed to address "Jean's practice of pleasing whomever she was with, frequently retracting purchases, and other similar decisions."  The trial court commended Chambliss Bahner and Ms. Brewer for attempting to establish donative capacity but concluded that Christina's actions "in acting first by writing the Check prior to the Meeting and then later attempting to utilize [Chambless Bahner] and its staff to 'bless' the transfer after-the-fact significantly reduces the persuasiveness of the [Chambliss Bahner] witness's testimony."

The trial court explained that Christina was attempting to overcome the presumption of undue influence by showing that "they obtained the advice of [Chambliss Bahner] before the $175,000 Check was deposited into Chris's account, even though the Check was written out 5 days *before* [Chambliss Bahner] had a chance to discuss Jean's wishes with respect to the transfer."  The court said that Christina had offered "proof that post-transaction capacity existed based on [Chambliss Bahner's] involvement" when there was little proof of capacity at the time of liquidation of the annuity or when the gift check was written.[16] "Put another way," the trial court added, "Chris is relying on the underlying fairness of the transfer as approved by [Chambliss Bahner] as a shield against undue influence."  The trial court quoted the definition of independent advice from *Turner v. Leathers*, 232 S.W.2d at 271, which bears repeating:

> The rule of independent advice means that the adviser must not only

---

[16] Because the trial court used the term "capacity" in this section of its order, Christina argues on appeal that the trial court impermissibly considered Jean's "competency" when her competency was not at issue. We disagree.  As Christina's attorney noted during closing arguments at trial, "This case is not about competency.  Plaintiffs have already said that clearly at the beginning of this case, "We're not challenging her competence.  We're challenging undue influence."  Counsel for the plaintiffs likewise stated, "We're not saying she was incompetent.  We're saying that this is evidence of her physical and mental deterioration."  Mental deterioration is specifically listed among the suspicious circumstances in the undue influence analysis.  Therefore, Jean's mental state was relevant to the undue influence claim.  In addition, the trial court accurately observed that Christina had essentially attempted to provide proof of "capacity" through the involvement of Chambliss Bahner.  Sally Brewer admitted that "job number one" for her was to see if Jean was competent and "had the capacity to sign."  Thus, the trial court's characterization of the testimony was not inaccurate.

- 41 -

be competent but independent.

> Proper independent advice in this connection means that the donor had the [preliminary] benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefactions.

The court found it "disturbing that Chris's first impulse was to speak with a non-lawyer with whom she had a prior, friendly relationship, rather than present all of the facts directly to Jean's attorneys." It noted Christina "anticipated Plaintiffs would take issue with the transfers" and wanted protection. The trial court found the timing of the events "suspicious" because Christina contacted Ms. Brewer after drafting the $175,000 check to herself. More importantly, however, the trial court found that "[Chambliss Bahner's] advice was not fully informed." It found that Chambliss Bahner "was acting with inadequate information in approving the transfer." The trial court found that Ms. Brewer was not in a position to make legal determinations and that she was not fully informed in any event. It pointed out that Mr. Barry admittedly did not know Jean extremely well, that he did not meet with Jean in person regarding the transfer, that he did not know about the liquidation of Jean's assets, and that most of his communication was with Christina rather than Jean herself. In summary, the trial court rejected Christina's position that "the transfers made to purchase the House were ratified by [Chambliss Bahner]." The trial court found that Christina's proof failed to overcome the presumption of undue influence by clear and convincing evidence.

We share the trial court's concerns with the suspicious timing of the events and the manner in which Christina contacted her business acquaintance at Chambliss Bahner seeking a legal document to ratify the gift after-the-fact. We also agree that Mr. Barry and Ms. Brewer were not fully informed about the gift. It appears that the main facts Mr. Barry knew about the gift were that Jean was giving Christina $175,000 for a house, that Jean had a general amount of wealth, and that the gift would not impoverish her. We cannot say that Jean's telephone conversation with Mr. Barry and subsequent meeting with Ms. Brewer met the definition of independent and complete advice regarding the advisability of the transfer. Adequate independent advice means "conferring fully and privately upon the subject of [the] intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences." *Turner*, 232 S.W.2d at 271. Christina insists that "[t]his is exactly the advice received from Ryan Barry." However, according to Mr. Barry, his conversation with Jean "involved, first and foremost, what do you want to do; and Ms. Ellis explained that she wanted to make this particular amount to Ms. Duggan as a lifetime gift." Mr. Barry said he "briefly mentioned to her that she would not owe any gift or estate tax" and

"the general fact that there are no take backs when you do lifetime gifts." He did not recall "specifically going through the dollar-for-dollar consequence of what's going where," but did recall saying, "What do you want to do? Here are the tax implications, and you do not get to undo this once it's done." He did not know Jean extremely well and could not recall whether he had ever met her in person. As for his knowledge of Jean's estate, he only generally knew that "there's several million in play out there from the husband's estate and from her estate and real estate and different assets." He "didn't discuss specifically how the gift fit into the estate plan from the standpoint of the documents and whatnot." He again summarized the content of their conversation as follows:

> [W]ith respect to the gifting, again, when I say I made sure that she was knowing what she wanted to do, that included not only what do you want with respect to amount and who, but, also, here is the tax implication and you know that there's no take backs when we're done with this.
> So, that's the long and short of any conversation I'm going to have with someone making a lifetime gift, including Ms. Ellis.

As the Supreme Court explained in *Turner*, however, "It is not a question of whether [the decedent] knew what he intended to do, but how this intention was produced, whether it was by abuse of a confidential and fiduciary relation." 232 S.W.2d at 271. In undue influence cases, the issue is not whether the person "knew what he was doing at the time." *Est. of Brimer v. Hennessee*, No. E2016-02136-COA-R3-CV, 2017 WL 5565627, at *3 (Tenn. Ct. App. Nov. 20, 2017). Rather, the issue is whether the weaker party's decision was a free and independent one or one induced by the dominant party. *Id.*

"[I]t is proof that the donor received independent and complete advice 'respecting *the consequences and advisability of the gift*' that constitutes an example of fairness." *In re Est. of Brindley*, 2002 WL 1827578, at *21 (quoting *Richmond*, 555 S.W.2d at 107-108) (emphasis added). In *In re Estate of Brindley*, we held that an attorney's testimony that he followed his normal procedures and that "the testator understood what the codicil did" would be relevant to establishing proper execution and testamentary capacity, but it was not sufficient to establish independent advice to overcome a presumption of undue influence. *Id.* There was no evidence that the testator "sought or received independent or complete advice regarding the advisability of the change in his codicil and no evidence that any independent advisor sought to determine how his intention was produced." *Id.* The same is true here. Briefly mentioning that Jean would not owe estate or gift tax and that the transaction cannot be undone does not rise to the level of full and complete advice regarding the advisability of the gift.

Likewise, Sally Brewer's meeting with Jean mainly focused on Jean's mental capacity and whether she knew what she wanted to do. Christina argues on appeal that Ms. Brewer "made the [] conclusion" during the meeting that Jean was not unduly influenced. However, as the basis for her conclusion, Ms. Brewer said she made "observations" of Jean

to determine whether she was being coerced, watching for signs of fear, isolation, overdependence, being overwhelmed, or having someone nearby winking at them or twisting their arm. Her "observations" did not constitute independent advice. *See Turner*, 232 S.W.2d at 271 (defining independent advice). Ms. Brewer also said her general practice is to ask someone if they are being unduly influenced, which again, would not constitute independent *advice*.[17]

In summary, we agree with the trial court's ultimate conclusion that numerous suspicious circumstances existed in this case, and that Christina failed to overcome the presumption of undue influence with clear and convincing evidence of the fairness of the transaction. Thus, the trial court's judgment against Christina for $176,000 is affirmed.

### B.    Attorney Fees

Finally, Plaintiffs seek an award of attorney fees incurred at trial and on appeal. Plaintiffs were required to bring this suit as assignees of Jean's estate when Chambliss Bahner declined to pursue an undue influence claim against Christina. As assignees of the estate, they assert that Christina should be required to pay their attorney fees. The trial court denied Plaintiffs' request for attorney fees on the basis that "[a]ttorney fees are not available under the current caselaw relating to undue influence."

"Tennessee has long followed the 'American Rule' with regard to attorney's fees." *Eberbach v. Eberbach*, 535 S.W.3d 467, 474 (Tenn. 2017) (citing *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000)). Pursuant to the American Rule, "a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American Rule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009).

An award of attorney fees was upheld under circumstances similar to those before us in *Martin v. Moore*, 109 S.W.3d 305, 307 (Tenn. Ct. App. 2003). In that case, a man

---

[17] On the issue of independent advice, Tennessee courts have considered advice from non-attorneys. *See, e.g.*, *Miller v. Hubbs*, 285 S.W.2d 527, 528 (Tenn. 1955) ("It, therefore, is obvious that the rule of *Turner v. Leathers* [] and other cases requiring independent and competent advice is fully met. What better and more competent advice could she have had than that of her husband whose wishes she followed after his death?"); *In re Est. of Norton*, No. E2010-02304-COA-R3-CV, 2012 WL 587481, at *6 (Tenn. Ct. App. Feb. 23, 2012) (considering that the decedent "availed himself of independent professional advice and counsel" from "no less than five unrelated, objective professionals," including attorneys and others); *Parish*, 308 S.W.3d at 893-94 (concluding that the decedent received "independent advice from two separate sources" - bank tellers and an attorney); *Nicholas v. Wright*, 301 S.W.2d 540, 550 (Tenn. Ct. App. 1956) ("[T]he advice which Mrs. Wright received from Mr. Allison, her banker, General Drane, her attorney, Mr. Joe Riddle, her attorney, and Mr. Ivy, her tax accountant, was sufficient to meet any test of competent independent advice which might be required under *Turner v. Leathers*, supra.").

who was diagnosed with dementia executed a power of attorney in favor of his wife. *Id.* She used the power to withdraw all of the money from her husband's separate account and sent most of it to her brother. *Id.* After the principal died, his daughter, who was the executrix of his estate, brought suit for breach of fiduciary duty, seeking a return of the funds. *Id.* The trial court ordered the return of the money and also ordered the wife to pay some of the daughter's attorney fees. *Id.* On appeal, this Court affirmed. At the outset, we explained that the existence of a confidential relationship, combined with a benefit to the dominant party, creates a presumption of undue influence and of the invalidity of the transaction, which can only be rebutted by clear and convincing evidence of fairness. *Id.* at 309-10. After affirming the trial court's decision to require return of the funds, we turned to the issue of attorney fees. *Id.* at 311, 313. The wife argued that there was no statutory or contractual basis for the award. *Id.* at 313. However, we found "a basis in case law" for the award. *Id.* We explained:

> [S]everal cases of this court support the proposition that attorney fees may be awarded against a trustee who breaches her fiduciary duty. *Brandt v. Bib Enterprises*, 986 S.W.2d 586 (Tenn. Ct. App. 1998); *Marshall v. First National Bank of Lewisburg*, 622 S.W.2d 558 (Tenn. Ct. App. 1981).
>
> Although attorney fees should not be imposed where there is merely a technical fault on the part of the fiduciary, 622 S.W.2d at 560, the imposition of such fees on fiduciaries who deliberately use their position of trust to enrich themselves creates a disincentive to such behavior. The trial court's finding that Ms. Moore intentionally withdrew her husband's separate funds from his checking account for her sole use and benefit is an appropriate predicate for the trial court's award.

*Id.*

This Court followed the *Martin* case to approve another award of attorney fees in *Lewis v. Lewis*, No. E2014-00105-COA-R3-CV, 2015 WL 1894267 (Tenn. Ct. App. Apr. 27, 2015). There, the decedent and his girlfriend both granted power of attorney to the decedent's son. *Id.* at *1. The decedent and his girlfriend also executed a deed conveying an interest in their farm to the son and his wife for less than one-third of its value. *Id.* Two days before the decedent died, the son withdrew $600,000 from accounts held jointly in the names of the decedent, his girlfriend, and the son. *Id.* The girlfriend brought suit to rescind the real estate and bank account transfers on the basis of undue influence. *Id.* The trial court found that the son exercised undue influence and also committed fraud and conversion. *Id.* It awarded attorney fees to the girlfriend. *Id.* On appeal, we found that the trial court properly found undue influence. *Id.* at *11. Regarding attorney fees, we explained the American Rule that "'in the absence of some statutory, contractual, or equitable ground, a litigant must pay for its own lawyer and, conversely, cannot be required to pay for another litigant's lawyer.'" *Id.* (quoting *Roberts v. Sanders*, No. M1998-00957-COA-R3-CV, 2002 WL 256740 at *10 (Tenn. Ct. App. Feb. 22, 2002)). We recognized

- 45 -

that there was "no statutory or contractual ground supporting the award of attorney's fees." *Id.* We explained that a finding of conversion does not necessarily support an award of attorney fees. *Id.* We noted that awards of attorney fees have been upheld based on findings of fraud, but we concluded that the trial court's finding of fraud was not supported by the record and could not support the award of attorney fees. *Id.* at *12-13. Still, we continued:

> There is, however, another ground that clearly supports the trial court's award of attorney's fees against Sam Lewis. In *Martin v. Moore*, a case where a wife wrongfully used her power of attorney executed by her disabled husband to withdraw funds from his bank account, we observed as follows:
>
>> [S]everal cases of this court support the proposition that attorney fees may be awarded against a trustee who breaches [his or] her fiduciary duty. *Brandt v. Bib Enterprises*, 986 S.W.2d 586 (Tenn Ct.App.1998); *Marshall v. First National Bank of Lewisburg*, 622 S.W.2d 558 (Tenn.Ct.App.1981).
>>
>> Although attorney fees should not be imposed where there is merely a technical fault on the part of the fiduciary, 622 S.W.2d at 560, the imposition of such fees on fiduciaries who deliberately use their position of trust to enrich themselves creates a disincentive to such behavior. The trial court's finding that Ms. Moore intentionally withdrew her husband's separate funds from his checking account for her sole use and benefit is an appropriate predicate for the trial court's award.
>
> 109 S.W.3d 305, 313 (Tenn. Ct. App. 2003). Under *Martin* and the cases cited therein, the trial court was supported in awarding attorney's fees against Sam Lewis on the ground of his abuse of his fiduciary duty by deliberately using his position of trust to enrich himself at the expense of his ward, Dorothy Lewis.

*Id.* at *13-14.

Finally, in *Scalf v. Harmon*, No. M2007-00350-COA-R3-CV, 2008 WL 741480 (Tenn. Ct. App. Mar. 19, 2008), defendants were caring for the decedent and were given power of attorney in case of the decedent's incapacitation. *Id.* at *1. After the decedent died, his daughter filed suit against the defendants for conversion. *Id.* The trial court found that the defendants converted various items of property but found no basis for any award of attorney fees. *Id.* at *2. On appeal, the plaintiff argued that the defendant should be ordered to pay her attorney fees on the basis that he "abused the confidential fiduciary relationship established by the power of attorney." *Id.* at *3. We considered *Martin* but concluded that attorney fees could not be awarded under the facts presented:

Plaintiff first claims that she should be awarded attorney fees because Johnny Harmon abused the confidential fiduciary relationship established by the power of attorney. *See Martin v. Moore*, 109 S.W.3d 305, 313 (Tenn. Ct. App. 2003) ("Although attorney fees should not be imposed where there is merely a technical fault on the part of the fiduciary, … the imposition of such fees on fiduciaries who deliberately use their position of trust to enrich themselves creates a disincentive to such behavior."). One clear but narrow exception to this rule under Tennessee law is when the power of attorney is executed, but never exercised. As explained in *Martin*:

> Our Supreme Court has recently announced a narrow exception to this rule. In *Childress v. Currie*, 74 S.W.3d 324 (Tenn. 2002), the Court ruled that if the power of attorney is executed, but not exercised, a confidential relationship does not arise as a matter of law.

*Martin*, 109 S.W.3d at 309.

In the present case, Plaintiff acknowledges that the power of attorney was never exercised by Johnny Harmon. . . .

. . . Therefore, the fact that Johnny Harmon held a power of attorney which was not used cannot form the basis for an award of attorney fees.

*Id.* at *3-4.

Keeping these principles in mind, we conclude that there is a basis in caselaw for awarding attorney fees to the Plaintiffs in this case. Christina had exercised the power of attorney many times, giving rise to a confidential relationship. She breached her fiduciary duties to Jean and obtained a gift by undue influence. The trial court specifically found that Christina "knowingly violated the POA to benefit herself." *Compare Martin*, 109 S.W.3d at 313 ("The trial court's finding that Ms. Moore intentionally withdrew her husband's separate funds from his checking account for her sole use and benefit is an appropriate predicate for the trial court's award [of attorney fees]."). Christina's actions did not consist of a mere technical fault but a deliberate abuse of her position. "[T]he imposition of [attorney] fees on fiduciaries who deliberately use their position of trust to enrich themselves creates a disincentive to such behavior." *See id*. As such, we conclude that Plaintiffs should be awarded their attorney fees at the trial level and on appeal. We remand for the trial court to determine a reasonable award.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is affirmed in part and reversed in part, and this case is remanded for further proceedings consistent with

this opinion.  Costs of this appeal are taxed to the appellee, Christina Duggan, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE